THE STANLEY WORKS AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26475-83.　　　　Filed August 12, 1986.

*Walter B. Slocombe* and *Geoffrey J. Vitt,* for the petitioner.

*Kendall C. Jones,* for the respondent.

SWIFT, *Judge*: In a statutory notice of deficiency dated June 17, 1983, respondent determined deficiencies in petitioner's Federal corporate income tax liabilities as follows:

| TYE— | Deficiencies |
|---|---|
| Jan. 1, 1978 | $773,642 |
| Dec. 31, 1978 | 1,138,709 |

The primary issue remaining for decision is the amount petitioner is entitled to deduct with respect to a charitable

contribution of a conservation easement in 668 acres of land located adjacent to the Housatonic River in northwestern Connecticut. Also at issue is whether petitioner, under section 6621(d),[1] is liable for the increased rate of interest imposed on substantial underpayments of tax attributable to tax motivated transactions.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The Stanley Works (hereinafter referred to as petitioner), is a Connecticut corporation with its principal place of business in New Britain, Connecticut. Petitioner and its wholly owned subsidiaries timely filed Federal consolidated corporate income tax returns for their taxable years ending January 1, 1978, and December 31, 1978.

Petitioner is a multimillion dollar corporation that principally is engaged in the manufacture and sale of hand tools and hardware. Between 1906 and 1916, petitioner acquired approximately 2,200 acres of unimproved land located on both sides of the Housatonic River in Litchfield County, Connecticut (hereinafter referred to as the Stanley Works property). Petitioner acquired the entire Stanley Works property for $48,582 and originally intended to dam the Housatonic River and to construct a hydroelectric power plant on the property. Petitioner intended to use the electricity generated at the proposed plant in one of its nearby manufacturing plants and to sell any excess electricity to local public utility companies.

Between 1918 and 1924, however, petitioner purchased a small Connecticut utility company, rebuilt the hydroelectric power plant owned by that company, and began generating electricity therefrom in 1924 for use in petitioner's Connecticut manufacturing plants. As a result thereof, petitioner did not pursue construction of a power plant on the Stanley Works property, and petitioner has not made any commercial or industrial use of the Stanley Works property since the time it was purchased. All 2,200 acres of the Stanley Works property constitute essentially a wilderness area with only a few old barns located thereon.

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

Two hydroelectric power plants were constructed on the Housatonic River in the 1920's. One was located on the river above and one was located below the Stanley Works property. In the early 1960's, the Connecticut Light & Power Co. offered to purchase the Stanley Works property for $500,000. It intended to construct thereon a hydroelectric power plant. Petitioner rejected the offer, but as a result of receiving the offer, petitioner in 1961 conducted a study of the feasibility at that time of constructing a hydroelectric power plant on the property. Petitioner's 1961 study concluded that construction of a conventional hydroelectric power plant on the Stanley Works property would not be economical, but that the property would be suitable for the construction thereon of a particular type of hydroelectric power plant known as a pumped storage plant.

A pumped storage plant provides supplemental electrical power during periods of peak energy demand in the following manner. During evenings or weekends when electrical power demand is low, water is pumped from a lower reservoir—such as a river or lake—up to a storage reservoir at a significantly higher elevation than the lower reservoir. When supplemental electrical power is needed during periods of peak energy demand, water is released from the upper reservoir. As water flows back down to the lower reservoir it passes through tunnels wherein it turns hydraulic turbine generators, thereby producing electrical power. The electrical power produced as the water flows through the turbines obviates the need during peak-demand periods to purchase or to produce a similar amount of electrical power by other, more expensive methods. The size of the upper and lower water reservoirs and the difference in their elevations determine the amount of electrical power that can be produced by a pumped storage plant.

The construction of pumped storage plants requires a particular site or land topography because the location of the upper reservoir must be at a sufficiently high elevation in relation to the lower reservoir, but not be too distant laterally from the lower reservoir, to permit efficient operation. Pumped storage plants also must be built adjacent to large natural sources of water that readily can supply the water that is pumped to the upper reservoirs.

A decision of a utility company to construct a pumped storage plant is based, in part, on forecasts of future demand for peak-period electrical power. In planning to meet that demand, a utility company also must consider the 10- to 15-year "lead time" it takes to license and construct a power plant. Utility companies in a particular region form "power pools" to forecast future energy demand and to coordinate and plan future construction of electrical power plants. Power pools do not have authority to direct member utility companies to construct new plants. The construction of new power plants by utility companies, however, is significantly influenced by the future energy requirements forecasted by the power pools.

In the northeastern United States, approximately 250 utility companies are members of the New England Power Pool (NEPOOL), and in New York approximately 10 utility companies are members of the New York Power Pool (NYPP). During the 1960's and early 1970's, the forecasts by NEPOOL and NYPP of the long-term demand for peak-period electrical power was an increase of 8 percent per year. Pumped storage plants were highly regarded by the utility industry and by Federal regulatory agencies as a viable means of meeting that expected increase in demand for sources of power during peak-demand periods.

In 1977, when petitioner donated the easement at issue herein, NEPOOL had forecasted a 5.4-percent annual increase in peak-demand electrical power and a need for 5,500 megawatts of additional electrical generating capacity to be produced from seven or more new pumped storage plants in New England. The first was projected to be finished and operational by 1992. Also in 1977, NYPP had forecasted the need for 2,500 megawatts of additional electrical generating capacity to be produced from pumped storage plants within its region.

Neither NEPOOL nor NYPP in 1977 had recommended specific sites for the new pumped storage plants that were forecasted over the subsequent 15 years and it was reasonable to assume that the Stanley Works property could have been selected as such a site.

The Stanley Works property was suitable for a mid-sized (800 megawatt) pumped storage plant due primarily to the

950-foot rise in elevation from the floor of the Housatonic River—where the river would be dammed to provide a lower reservoir—to the area where the upper reservoir most likely would be constructed (referred to as Pine Swamp). Pine Swamp was not located within the 2,200-acre Stanley Works property and, therefore, any developer of a pumped storage plant who intended to use the Stanley Works property as the site of a lower reservoir would have been required to purchase Pine Swamp or other nearby land as the site for the upper reservoir.

During the 1960's, interest increased in constructing a pumped storage plant on the Stanley Works property. In 1963, Connecticut Light & Power Co. considered 27 potential pumped storage sites in Connecticut and western Massachusetts. Of the 27 sites considered, 24 sites were eliminated upon initial inspection. The Stanley Works property was one of the remaining three sites that were considered in detail and it was recommended as the superior site of the three sites under final consideration on which a mid-sized pumped storage plant might be constructed. The 1963 study estimated the cost of acquiring the Stanley Works property at that time at $1,500,000.

In 1966, Connecticut Light & Power Co. merged with Northeast Utilities, the largest public utility company in the NEPOOL region. Sometime thereafter, Northeast Utilities purchased the Pine Swamp property and identified the Stanley Works property on its internal planning maps as the possible site for construction of a pumped storage plant.

In 1967, Northeast Utilities considered four potential pumped storage sites, including the Stanley Works property, and concluded that of the four sites considered at that time, the Stanley Works property was the least suitable site, primarily due to the limited size and generating capacity of any pumped storage plant that could be built thereon. As a result of the conclusions it reached in 1967, in early 1970, Northeast Utilities applied to the Federal Power Commission (FPC)[2] for study permits (a preliminary step before applying for a Federal license) to conduct further

[2]The FPC is the Federal agency responsible for licensing the construction of all power plants in the United States and is now known as the Federal Energy Regulatory Commission, or FERC.

indepth, on-site examinations of two of the four sites it had considered in 1967. The two sites selected for further consideration were at Canaan Mountain, Connecticut, and at Sheffield, Massachusetts. Those sites both were suitable for large (2,000 megawatt) capacity pumped storage plants and were located 20 to 30 miles north of the Stanley Works property on tributaries of the Housatonic River.

During the late 1960's and early 1970's, public utility companies throughout the United States (particularly Northeast Utilities) became more sensitive to the increasing public concern for environmental planning in the construction of power plants. In 1969, Peter Stern (Stern), the vice president for environmental planning at Northeast Utilities, personally inspected the Stanley Works property and advised the company's board of directors that any proposal it might entertain to construct a pumped storage plant on that property would encounter major environmental opposition.[3] Upon Stern's recommendation, Northeast Utilities did not further investigate the construction of a pumped storage plant on the Stanley Works property. In 1971, Northeast Utilities also withdrew from the FPC its applications for study permits with respect to the Canaan Mountain and Sheffield sites.

In July of 1973, the New England River Basin Commission (NERBC), a Federal commission established to coordinate the planning efforts of public utility companies in New England, issued a report concerning 52 potential pumped storage sites in the northeastern United States. The report identified the Stanley Works property as such a potential site. It concluded, however, that the construction of a pumped storage plant on the Stanley Works property would cause "obvious and unacceptable environmental disruptions" due to "unique river characteristics [of the] lower pool." The NERBC report provided no further elaboration of its conclusion regarding the Stanley Works property, but its conclusion in regard thereto was based on the erroneous

---

[3]Stern noted a number of factors that prompted his recommendation, including: (1) The construction of a pumped storage plant on the Stanley Works property would have eliminated the free-flowing state of the Housatonic River; (2) the configuration of the site would have caused an approximate 20-foot fluctuation in the lower reservoir thereby seriously impairing the aesthetic quality and recreational use of the property; and (3) the lower reservoir would have had an impact on Kent Falls State Park and would have impaired the scenic quality of waterfalls located in the park.

assumption that a 2,100-megawatt pumped storage plant would be constructed on the Stanley Works property, rather than an 800-megawatt plant as previously had been anticipated by Northeast Utilities. A 2,100-megawatt pumped storage plant would require a significantly larger lower reservoir, inundate a significantly larger area of land, and result in significantly greater environmental impact to the Stanley Works and surrounding properties than would an 800-megawatt pumped storage plant.

By letter to Northeast Utilities dated November 9, 1973, petitioner inquired as to that company's intention with respect to the Stanley Works property. After a "comprehensive review," Northeast Utilities responded by letter dated January 24, 1974, "that it would not now * * * purchase the property."

On October 12, 1976, 41 miles of the Housatonic River, including the 7 miles of the river that flow through the Stanley Works property, became the subject of a study pursuant to the Federal Wild and Scenic Rivers Act, 16 U.S.C. sec. 1271 et seq. (1982). The Wild and Scenic Rivers Act was passed by Congress in 1968 (82 Stat. 906 (1968)), to protect and preserve in free-flowing condition rivers that possessed outstanding scenic or recreational characteristics. At the instigation of either Congress or a State legislature, rivers were to be selected pursuant to that act for study by the Secretary of the Interior. If, after study, the Secretary recommended to Congress that a particular river should be designated for Federal protection, Congress had a 3-year period in which to vote on the recommendation. One important consequence of designation for study as a scenic river under that Federal statute was that the FPC was prohibited from licensing the construction of any hydroelectric power plant on the river during the 3-year period the river was under study by the Secretary of the Interior and during the additional 3-year period legislation was being considered with respect to a particular river.

If Congress voted to include a particular river in the Federal river system, the FPC thereafter was prohibited from licensing the construction of any hydroelectric power plant on the river. The act does not provide for compensation to riparian landowners. Therefore, as of October 12,

1976, because of its designation for study as a river with outstanding scenic and recreational characteristics, there existed a federally imposed 3-year moratorium on the construction and licensing of all power plants on the Housatonic River. It was during this moratorium period that petitioner donated the easement at issue herein.

On October 2, 1979, the study conducted by the Secretary of Interior recommended that the Housatonic River not be included in the Federal river system and that environmental protection of the Housatonic River was better left to State and local officials. That recommendation apparently was prompted by the objection of most owners of land adjacent to the Housatonic River to federally imposed environmental controls. The Housatonic River thus remained under State control and the moratorium applicable to development of the Housatonic River expired in 1982.[4]

Prior to its donation of the easement in question, petitioner had made donations of other interests in the Stanley Works property for purposes of historical or environmental conservation. In 1968 and 1976, petitioner donated a fee interest in 27 acres of the Stanley Works property to the State of Connecticut for a museum.

Also in 1976, petitioner donated a fee interest in 132 acres of the Stanley Works property to an environmental conservation organization. That property consisted of a portion of the St. John's Ledges, a particularly scenic stretch of cliffs along the Housatonic River, and an additional 12 acres for a park. Petitioner also granted in 1976 to the same environmental conservation organization a 200-foot-wide easement through the Stanley Works property (approximately 50 acres) for use as part of the Appalachian Trail. The Appalachian Trail stretches from Maine to Georgia, and the 5-mile stretch that runs along the Housatonic River through the Stanley Works property is the longest river walk on the Appalachian Trail.

In making the above donations in 1968 and 1976, however, petitioner at all times preserved its right to dam the Housatonic River and flood the Stanley Works property to the 405-foot topographic contour level consistent with its

---

[4]The Federal study of the Housatonic River commenced on Oct. 12, 1976, and ended Oct. 2, 1979. The additional 3-year moratorium on Federal licensing expired on Oct. 2, 1982.

original intention to construct a hydroelectric power plant thereon. Petitioner also expressly retained the right to relocate the portion of the Appalachian Trail on its property since construction of a lower reservoir on the Stanley Works property for a pumped storage plant would inundate the original portion of the Appalachian Trail on the property.

On June 10, 1977, petitioner transferred to the Housatonic Valley Association (HVA) the easement at issue herein encompassing approximately 7 miles of river-front land. The easement was conveyed for a term of 30½ years. It barred all commercial development on 668 acres of the Stanley Works property and required preservation of the land in its natural, scenic, and open condition. The easement also barred the construction of any hydroelectric power plant for the 30½-year life of the easement on any portion of the entire Stanley Works property.[5]

The HVA is a qualified charitable donee as described in section 170(c), and was formed to preserve the scenic environment of the Housatonic River Valley. Under the terms of the easement, HVA was given the right to enforce the easement, to verify that the limits on development were complied with, and to permit limited research and recreational use of the property. The easement did not confer on HVA any valuable affirmative rights to develop the property. Petitioner continued to be obligated to pay real estate taxes with respect to the property.

On its Federal corporate income tax returns for its taxable years ending January 1, 1978, and December 31, 1978, petitioner valued the conservation easement donated to the HVA at $12 million. Because of the limitation on corporate charitable deductions then in effect under section 170(b)(2), petitioner deducted $2,236,253 with respect to the donation of the easement in its taxable year ended January 1, 1978. Pursuant to the carryover provisions of section 170(d)(2), petitioner deducted $2,372,311 with respect to its

---

[5]The deed that conveyed the easement was signed by representatives of the HVA and petitioner just 4 days before the effective date of a new Federal tax provision that limited charitable deductions allowable under sec. 170(f)(3)(B)(iii) to easements that were granted in perpetuity to qualified charitable donees. The parties herein agree (and the Court does not intend to suggest otherwise) that the deed was a valid legal instrument and that petitioner is entitled to take advantage of sec. 170(f)(3)(B)(iii) as it was effective for contributions made prior to June 14, 1977. Cf. *Hagler v. Commissioner*, 86 T.C. 598 (1986).

donation of the easement in its taxable year ended December 31, 1978.

In his notice of deficiency, respondent determined that the decrease in the value of the Stanley Works property as a result of the easement was $619,700, and respondent disallowed the charitable deductions claimed with respect to the donation to the extent they exceeded that amount. The parties now agree for the purposes of this case that the decrease in the value of the Stanley Works property as a result of the donation of the easement was at least $1,100,000. That amount ignores any value accruing to the property relating to its potential as the site for construction of a pumped storage plant.

At trial held in Washington, D.C., expert witnesses, among others, testified for petitioner and respondent as to the likelihood, at the time the easement was donated to HVA, that the Stanley Works property would have been developed as the site for a pumped storage plant. Testimony also was presented concerning the value of the property and the effect of the easement on the value of the property.

## OPINION

### *Valuation of the Conservation Easement*

Generally, under section 170(f)(3)[6] no deduction is allowed with respect to a charitable contribution of less than the

---

[6]Sec. 170(f)(3) as in effect for gifts made prior to June 14, 1977, provides in relevant part:

(3) DENIAL OF DEDUCTION IN CASE OF CERTAIN CONTRIBUTIONS OF PARTIAL INTERESTS IN PROPERTY.—

(A) IN GENERAL.—In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest had been transferred in trust. * * *

(B) EXCEPTIONS.—Subparagraph (A) shall not apply to a contribution of—

\*        \*        \*        \*        \*        \*        \*

(iii) a lease on, option to purchase, or easement with respect to real property of not less than 30 years' duration granted to an organization described in subsection (b)(l)(A) exclusively for conservation purposes * * *

(C) CONSERVATION PURPOSES DEFINED.—For purposes of subparagraph (B), the term "conservation purposes" means—

(i) the preservation of land areas for public outdoor recreation or education, or scenic enjoyment;

(ii) the preservation of historically important land areas or structures; or

(iii) the protection of natural environmental systems.

taxpayer's entire interest in the property contributed. In 1976, however, Congress expressly provided an exception for, among other things, contributions of easements with respect to real property of not less than 30 years' duration that are donated to qualified charitable organizations exclusively for conservation purposes. Sec. 170(f)(3)(B)(iii) and (C). Conservation easements ordinarily do not confer on the owners thereof any affirmative rights for development of the property. They do, however, provide a general benefit to society by restricting the donor's full use of the property and thereby preserving in an undeveloped state uniquely scenic land, buildings, and natural resources.

The gift of a conservation easement to a qualified charitable organization is not, per se, a tax gimmick. Congress fully intended to allow a deduction with respect to such contributions, and respondent concedes that petitioner meets all the requirements of section 170(f)(3)(B)(iii) and (C).

The amount allowed as a deduction with respect to a charitable contribution of property usually is determined by the fair market value of the property on the date of the gift. Sec. 1.170A-1(c)(2), Income Tax Regs.[7] If no comparable sales of easements are available to determine the value of the easement in question, the value of a conservation easement for tax purposes will be determined by the "before and after" valuation of the underlying property. Under that approach, the difference between the fair market value of the Stanley Works property immediately before the contribution of the easement is to be compared with the fair market value of the property immediately after the easement was contributed. See, e.g., *Hilborn v. Commissioner*, 85 T.C. 677, 688 (1985); *Akers v. Commissioner*, T.C. Memo. 1984-490, on appeal (6th Cir., Feb. 8, 1985); *Thayer v. Commissioner*, T.C. Memo. 1977-370. See also sec. 1.170A-14(h)(3)(ii), Income Tax Regs., applicable to gifts made after Dec. 18, 1980. The parties now agree that the contribution of the easement decreased the fair market value of the Stanley Works property by at least $1,100,000 and that no portion of that agreed-upon decrease is attributable to the

---

[7]"Fair market value" is defined in sec. 1.170A-1(c)(2), Income Tax Regs., as—

"the * * * price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts. * * *"

potential to develop the property as the site for a pumped storage plant.

Petitioner contends that an additional $10,900,000 decrease in the value of the Stanley Works property occurred as a result of the conveyance of the easement and that that additional decrease in value is attributable to petitioner's inability (for 30-plus years thereafter) to construct a pumped storage plant on the property. Respondent contends that whatever potential previously may have existed for construction of a pumped storage plant on the Stanley Works property, such potential realistically no longer existed in 1977. Respondent, therefore, contends that other than the agreed upon $1,100,000 decrease in value, no decrease in the value of the Stanley Works property occurred in 1977 as a result of the contribution of the easement.

The fair market value of property reflects the highest and best use of the property on the relevant valuation date. Any realistically available special use of property due to its adaptability to a particular business is an element that must be considered in determining the fair market value thereof. *Mitchell v. United States*, 267 U.S. 341, 344-345 (1925); *Hilborn v. Commissioner, supra.* The fair market value of property is not affected by whether the owner actually has put the property to its highest and best use. The realistic, objective potential uses for property control the valuation thereof. *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958). One court commented on this principle of valuation many years ago as follows: The landowner "may have used a valuable corner [of property] for a stable or for a pigsty * * * [but] he is not obliged to have it priced on that basis." *Central Georgia Power Co. v. Stone*, 139 Ga. 416, 419, 77 S.E. 565, 567 (1913).

Several cases have addressed the application of the above principles of valuation to property suitable for a hydroelectric power plant. The special suitability of property as the site for a hydroelectric power plant is a factor to be considered in determining its fair market value. *Grand River Dam Authority v. Grand-Hydro*, 335 U.S. 359, 372-373 (1948); *Olson v. United States*, 292 U.S. 246, 257 (1933); *United States v. Cooper*, 277 F.2d 857, 861 (5th Cir.

1960); *Week v. Commissioner*, 26 B.T.A. 340 (1932), affd. 68 F.2d 693 (9th Cir.), cert. denied 292 U.S. 657 (1934). Physical suitability of property, however, for a hydroelectric power plant is not deemed sufficient in and of itself to affect the market value of the property. Before an additional element of value may be attributed to potential use of property for the construction of a hydroelectric power plant, the taxpayer must establish that there existed a reasonable probability the land would be so used in the reasonably near future. *Olson v. United States, supra* at 257.

In *Olson v. United States*, the United States instituted a condemnation proceeding to acquire water drainage easements over certain property in Minnesota adjacent to a lake which straddles the U.S.-Canadian border.[8] The property owner argued that his property, if joined with several adjacent properties, could have been used for construction of a power plant, and that the fair market value of damages to the property as a result of the easements the Government obtained should reflect that potential use of the property. The Supreme Court held that, in spite of the suitability of the property in question for construction of a power plant, there was no reasonable probability the property would be acquired for that purpose in the reasonably foreseeable future. The Court held, therefore, that no element of the property's value legitimately could be attributed to the suitability of the property for construction of a power plant. The Supreme Court stated in *Olson*—

Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth. * * * [292 U.S. at 257.]

The focus of the above-quoted language, as applied to this case, is whether it is reasonable to conclude that a hypothetical willing buyer in 1977 would have considered the Stanley Works property as the site for construction of a

---

[8]The principles and legal precedents governing the determination of fair market value of property in tax cases are the same as those that control the valuation of property in condemnation cases. *Great Northern Railway Co. v. Weeks*, 297 U.S. 135, 139 (1936); *Klopp v. Commissioner*, T.C. Memo. 1960-185.

pumped storage plant. If a hypothetical buyer would not reasonably have taken into account that potential use in agreeing to purchase the property, such potential use should not be considered in valuing the property. *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir. 1979).

In considering whether there is a reasonable probability that property will be used as the site for construction of a hydroelectric power plant, it is important to know whether additional land would have to be purchased to construct the power plant. If so, it must be reasonably probable that the property owner would be able to acquire the additional land in the reasonably near future without relying on the power of eminent domain. *United States ex rel. Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 276 (1942) (*Powelson*). In the absence of such a showing, the prospect for the use of property as the site for the construction of a power plant is regarded as too remote and speculative and will not be considered in the valuation of property. *Powelson, supra* at 276, citing *McGovern v. City of New York*, 229 U.S. 363, 372 (1913).

Legal restrictions on the use of property are relevant in determining whether an alleged use of property is reasonably probable. In *Great Northern Nekoosa Corp. v. United States*, 544 F. Supp. 511 (D. Me. 1982), affd. 711 F.2d 473 (lst Cir. 1983), a taxpayer donated to the State of Maine a perpetual easement with respect to 207 acres of land on the Allagash River in northern Maine. The taxpayer claimed a charitable contribution deduction with respect to the donation in the amount of $1 million. As the basis for its valuation of the easement, the taxpayer claimed that the highest and best use of the property before the donation was for the construction of a hydroelectric power plant. The claimed deduction was disallowed because at the time the donation was made, State laws had been enacted to preserve the natural scenic beauty of the Allagash River. The State laws absolutely prohibited the construction of any hydroelectric power plant on the Allagash River. In addition, in 1969 when the donation was made, the Allagash River was being considered for inclusion in the Federal river system, and the river actually was included in the system in 1970. The District Court found that legal obstacles to the

development of a power plant on the taxpayer's land foreclosed any special use valuation thereof as the potential site for the construction of a hydroelectric power plant. 544 F. Supp. at 515. In affirming the decision of the District Court, the First Circuit held that, as of the date of the donation, designation of the Allagash River as part of the Federal scenic river system was so certain to occur that it necessarily would have significantly reduced the price any knowledgeable buyer would have paid for the property. 711 F.2d at 475. See also sec. 1.170A-14(h)(3)(ii), Income Tax Regs., applicable to donations made after Dec. 18, 1980.

Having reviewed the legal principles applicable to the valuation of charitable easements and the valuation of property where it is alleged that the property has a particular special use, we turn to the specific contentions of the parties herein. As explained, petitioner asserts that the value of the Stanley Works property was diminished by $10,900,000 as a result of the easement it donated to the HVA. The original Stanley Works property consisted of approximately 2,200 acres. Because of donations by petitioner of approximately 150 acres of the property to charitable donees before the donation of the easement in question, the parties herein agree that the total acreage remaining a part of the Stanley Works property at the time of the donation in question in 1977 was 2,100 acres. The parties also agree that although the easement primarily affected only 668 acres of the property, it affected the value of the entire 2,100 acres because, under the terms of the easement, petitioner was precluded from constructing a power plant on any portion of the property.

Petitioner argues that in 1977 the Stanley Works property was recognized by the utility industry as one of the few sites in the northeast region of the United States that was suitable for a pumped storage plant; that demand in the northeast region for peak electrical power was projected to increase; and that construction of additional pumped storage plants in the reasonably near future was anticipated. Petitioner admits that development of a pumped storage plant on the Stanley Works property would have had adverse environmental impact on the Housatonic River and the Appalachian Trail, but petitioner argues that such

impact could have been mitigated and would not have been so great as to preclude construction of a power plant on the property.

Petitioner offered evidence from expert witnesses concerning the generation of electrical power by pumped storage plants, concerning environmental laws regulating such plants, and concerning the value of petitioner's property. Petitioner's expert on pumped storage plants testified that demand in the United States for electrical power experienced uninterrupted growth of about 8 percent per year between 1945 and 1973, and that during those years the number of power plants in the United States doubled approximately every 10 years.

During the Arab oil embargo in 1973 and 1974, electricity generated from fossil fuels became more costly, energy conservation efforts increased, and projected growth in peak-power demand in the NEPOOL region declined to 3.5 percent per year. By 1977, however, long-term growth in peak-power demand, as forecasted by NEPOOL, had rebounded to an average annual growth rate of 5.5 percent and construction of new power plants was expected to continue. Petitioner's expert opined that in 1977 the need for as many as 10 new pumped storage plants was projected in the NEPOOL and NYPP regions to meet the forecasted increase in demand for peak power.

Petitioner's expert on pumped storage plants also testified that the Stanley Works property was one of the most desirable sites in the NEPOOL and NYPP regions for such a plant. He noted that many utility companies throughout the northeast region could have utilized the electrical power generated from a pumped storage plant on that property through existing power transmission networks and interconnection agreements. The expert stated that although Pine Swamp would be the preferred site for the upper reservoir, a number of other sites also would be suitable for the upper reservoir.

Petitioner submitted evidence from an environmental law expert who concluded that construction of a pumped storage plant on the Stanley Works property would have had little impact on noise level and water quality, and generally would not have been prohibited by land use or

aesthetic considerations. The expert did concede that a pumped storage plant would adversely affect wetlands and certain rare or endangered mammal and amphibian species living on the Pine Swamp property, but he opined that those consequences could be mitigated and would not have barred licensing of a power plant. The expert testified that in the past 50 years, the Federal Government has licensed hundreds of hydroelectric power plants, but in only one instance has a license been denied for environmental reasons, and that it would have been highly unlikely for the FPC in 1977 to have refused to license the construction of a small and relatively noncontroversial pumped storage plant on the Housatonic River.

Petitioner's environmental law expert testified further that there was only a slight chance the Housatonic River would be included in the Federal Wild and Scenic Rivers system. The expert opined that in June of 1977 it would have been obvious to anyone familiar with the Housatonic River that the local political support essential for inclusion of the river in the Federal river protection system was lacking.

Finally, petitioner's expert on valuation of the Stanley Works property used three methods to value the property before the easement in question was donated to the HVA. First, he analyzed 16 pumped storage plants operating in the United States in 1977 and found that the land acquisition cost of each plant was about 6 percent of total plant costs. The expert then estimated the 1977 cost of constructing an 800-megawatt pumped storage plant (exclusive of land) at $203 million and by applying the 6-percent cost factor for the land concluded that the cost of acquiring the Stanley Works property would have been approximately $13 million.

The second method used by petitioner's valuation expert to value the Stanley Works property before the easement was donated started with the 1963 study of the Stanley Works property by Connecticut Light & Power Co., which had placed an estimated purchase price on the property of $1,500,000. He increased that 1963 estimated cost to 1977 land prices using a land inflation factor of 3.6 percent, reflecting the general rise in the price of farm property in

Connecticut between 1963 and 1977. Under that method, petitioner's expert estimated the fair market value of the Stanley Works property in 1977 to be $5,394,000.

The third method used by petitioner's expert for valuing the Stanley Works property before the easement was donated was based on the average price paid per acre for land on which pumped storage plants were constructed in the northeast region of the United States, adjusted for inflation to 1977 prices using a 3.6-percent inflation factor. Under that method, the average per-acre value of such land was $3,327, which results in an estimated value for the Stanley Works property of $6,986,700. Petitioner's expert also contends that because the Stanley Works property was a large, already-assembled tract of land, it would command a 20-percent premium under this third method (or a total price of $8,384,040) from a hypothetical buyer because the buyer would be able to avoid the time and expenses of assembling smaller tracts of land from several sellers.

With regard to the value of the 2,100-acre Stanley Works property after the easement was donated, petitioner presented evidence that the price for which farmland in Connecticut was selling in 1977 was $800 per acre, or a total "after value" of $1,680,000.

Respondent contends that although in the early 1960's some interest had been expressed by local utility companies in the Stanley Works property as the site for construction of a pumped storage plant, by the early 1970's the site had been finally rejected for that purpose because of environmental concerns and because of the limited forecasts at that time for additional pumped storage plants in New England. Respondent emphasizes the public opposition in New England and in communities along the Housatonic River to other power plant projects in the early 1970's and the failure of petitioner or any utility company in the region to actually plan a specific project for the Stanley Works property. Respondent also contends that there is no competent evidence in the record to support the $12 million value for the easement as claimed by petitioner.

Respondent and petitioner agree that as a result of the contribution of the easement, the diminution in the value of the Stanley Works property without regard to its potential

as a pumped storage plant was $1,100,000, but respondent has offered no alternative valuation of the property before the donation of the easement should we find that the value of the property is to be determined with reference to its potential use as a pumped storage plant.

An expert witness for respondent testified that delays in and cancellations of the construction of nuclear power plants (which provide most of the power for the region) had diminished the need for additional pumped storage plants in New England by 1977.[9] He relies on a NEPOOL projection in 1975 that no new pumped storage plants would be necessary in the region through the mid-1980's. Although he forecasted a demand, as of 1977, for an additional 2,000 megawatts of pumped storage capacity by the early 1990's, respondent's expert suggested that that additional capacity would have been supplied by Northeast Utilities' planned pumped storage plants at Canaan Mountain or Sheffield. Therefore, in the expert's opinion, in 1977, there would have been no interest in using the Stanley Works property as the site for a pumped storage plant.

Even if there were additional demand for pumped storage plants, respondent argues that environmental objections would have precluded licensing of the Stanley Works property for construction of a pumped storage plant. Respondent points to the 1973 NERBC study which rejected the Stanley Works property as a potential site for a pumped storage plant due to "obvious and unacceptable environmental disruptions," and to the rejection of the site for the same use by Northeast Utilities in 1974. Respondent's expert opined that destruction of a white-water canoe run, flooding of the Appalachian Trail, and interference with the view of the St. John's Ledges, all of which would result from construction of a dam on the Housatonic River (if a pumped storage plant was constructed on the Stanley Works property), were significant environmental factors that support his conclusion.

What has been said previously regarding the valuation of property particularly applies to the valuation problem

[9]Because pumped storage plants supplement electrical power output of other electrical generating plants during peak periods, a reduction in the number of primary plants (such as nuclear power plants) reduces the need for pumped storage plants.

presented to us in this case. The issue presents a fact question that can be resolved only by weighing all of the evidence. The issue presents a problem of judgment, not mathematics. *Hamm v. Commissioner*, 325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. "Valuation is * * * necessarily an approximation." *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. It is an inexact science at best, capable of resolution only by "Solomon-like" pronouncements. *Ketteman Trust v. Commissioner*, 86 T.C. 91, 98 (1986); *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *Estate of Heckscher v. Commissioner*, 63 T.C. 485 (1975). The Second Circuit has stated that—

finding market value is, after all, something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation. [*Colonial Fabrics v. Commissioner*, 202 F.2d 105, 107 (2d Cir. 1953).]

We carefully have examined all of the testimony and documentary evidence introduced in this case. The testimony of each of the expert witnesses has been helpful. We are satisfied that, at the time the easement was conveyed to the HVA, there was a reasonable probability the Stanley Works property would be developed as a pumped storage plant in the reasonably near future. Therefore, the value of the property before the gift of the easement should reflect that potential special use. Our conclusion is based primarily on the following factors that existed at the time of the gift: (1) The anticipated need for additional pumped storage capacity to meet the increase in demand for peak electrical power that was forecast; (2) the suitability of the Stanley Works property for a pumped storage plant and its identification as such by the utility industry over many years; (3) hydroelectric power plants regularly are constructed in spite of some adverse environmental effects; and (4) environmental opposition to the construction of a pumped storage plant on the Stanley Works property would, in our opinion, not likely have been so great as to preclude its licensing or construction.

Respondent's argument that there was little, if any, anticipated need for additional pumped storage plants in the

NEPOOL region is not supported by the evidence. Although demand for peak electrical power had declined during the years following the Arab oil embargo, demand had not diminished entirely. In 1977, NEPOOL was forecasting the need for an additional 5,500 megawatts of peak electrical capacity. Respondent's expert conceded that an additional 2,000 megawatts would be necessary by the 1990's. Respondent's contention that the additional demand would be supplied by the Caanan Mountain or Sheffield plants is not persuasive because by 1977 Northeast Utilities already had abandoned its plans to build those plants.

Citing *Powelson*, respondent argues that there was no reasonable probability the Stanley Works property would have been developed as a pumped storage site because any developer thereof would have had to acquire a site for the upper reservoir from an unrelated party. In *Powelson*, the landowner was denied compensation based on a special use valuation of his riparian land because he failed to demonstrate a reasonable probability that his land could be assembled with four other parcels to facilitate the construction of a hydroelectric power plant. Respondent's argument is not supported by the facts of this case. Although a developer of petitioner's property in the instant case would have had to acquire additional property for the site of the upper reservoir, there were several possible sites and there is no evidence to suggest that it would have been unreasonably difficult to acquire such property.

The Stanley Works property was topographically suitable for development of a pumped storage plant. Its rejection by Northeast Utilities and by the NERBC study does not indicate that there was no interest in so developing the property. Northeast Utilities is only one of many utility companies in the region. We also place little significance on the rejection of the Stanley Works property in the 1973 NERBC study. The rejection of the property therein erroneously was based on the environmental impact of constructing a 2,100-megawatt plant, rather than an 800-megawatt plant for which the property was suitable. Moreover, the expert witnesses of both parties agreed that the NERBC study contained many errors and was not conducted in a professional manner. As stated, the record makes it abun-

dantly clear that the Stanley Works property was identified and considered for many years as a potential site for the construction of a power plant.

Environmental opposition to the construction of a pumped storage plant on the Stanley Works property would not likely have been so great that the FPC would have denied a license for construction of the plant. In 1977, the FPC almost never declined to license a power plant on the basis of environmental factors alone. Expert testimony established to our satisfaction that the environmental effects of damming the river could have been mitigated. The Appalachian Trail could have been moved 200 feet to the west, with the result (according to the testimony) that the view of the river actually would have been enhanced from the new location. Animal life also could have been relocated, and whatever archeological or historical artifacts were located on the property (the significance and extent of which are not established in the record) could have been unearthed and relocated as well. The only potential adverse environmental impact to the river that could not have been mitigated would have been the elimination of one white-water section of the river that was popular with local canoeists.

Respondent relies strongly on *Great Northern Nekoosa Corp. v. United States, supra,* and argues that, as in that case, the prospect of Federal protection of the Housatonic River under the Wild and Scenic Rivers Act was sufficient to make improbable any development of a hydroelectric power plant on the Stanley Works property. The environmental measures and concern that eventually foreclosed development of the riparian lands on the Allagash River in *Great Northern Nekoosa Corp.,* however, were far greater than were the measures and concern applicable to the Housatonic River. Indeed, at the time the gift was made in that case, State laws already had prohibited construction of all hydroelectric power plants on the Allagash River. Moreover, the prospect of Federal control of the Allagash River under the Wild and Scenic Rivers Act was almost certain to occur because Congress had invited the State of Maine to include the Allagash River in the Federal river protection system and there was great public support

therefor. In the instant case, the State of Connecticut had enacted no similar legislation to protect the Housatonic River, nor was any planned, and Federal protection of the Housatonic River was unlikely due to limited local support therefor.

The moratorium imposed on development of the Stanley Works property in 1977 as a result of the Federal study of the Housatonic River would not have been a significant deterrent to the construction of a pumped storage plant on the property. As we have said, in spite of the Federal study, inclusion of the Housatonic River in the Federal river protection system was unlikely. Also, because of the long lead time required in the construction of a power plant (including a lengthy licensing period before any construction can begin), the moratorium extending through 1982 would not significantly have affected the value of the Stanley Works property.

Finally, we are unable to conclude that local opposition to development of the Stanley Works property would have been so great as to make reasonably improbable the construction of a power plant thereon. There is little evidence in the record as to the reasons Northeast Utilities withdrew its plans to construct power plants on the Canaan Mountain and Sheffield sites. Although local citizens favored some environmental protection of the Housatonic River by State and local agencies, there is no credible evidence that such interest likely would have prompted local opposition to a pumped storage plant on the Stanley Works property sufficient to force abandonment of such a project.

In light of our conclusion that (immediately prior to the donation in 1977 of the easement in question) there did exist a reasonable probability that the Stanley Works property would be used as the site for construction of a pumped storage plant in the reasonably near future, we now must determine the proper decrease in the value of the property as a result of the donation of the easement which precluded any such development. Petitioner presented alternative methods of valuing the property because no comparable sales exist. As indicated, respondent did not present any evidence on the value of the property with respect to its potential use as a pumped storage facility.

In our opinion, none of the methods used by petitioner's experts to determine the value of the property before the easement was donated are completely reliable. The first method (producing a value of $13 million) was based on a comparison of land acquisition costs with total project costs. All sites were treated as comparable to the Stanley Works property in spite of obvious differences in size and location, among other things. The second method (producing a value of $5,394,000) was based on an estimate in the 1963 study of the value of the Stanley Works property adjusted for inflation, but there was no evidence presented on which we reliably can conclude that the 1963 study by Connecticut Light & Power Co. correctly estimated the value of the property. The third method (producing a value of $8,384,040) is derived from an average per-acre price for land used in the construction of pumped storage plants in the New England region, increased by a 20-percent premium which petitioner contends a hypothetical buyer would pay because he would be able to acquire all the necessary land from one seller. The per-acre price paid for pumped storage land produces a reasonably reliable guide to the value of the Stanley Works property. The premium, however, for assemblage is not appropriate herein because a hypothetical buyer of the Stanley Works property would be required to acquire land for the upper reservoir from parties unrelated to Stanley Works.

After the easement was donated, the parties agree that the Stanley Works property essentially was suitable only for use as farmland and the only evidence in the record concerning the value of Connecticut farmland in 1977 indicates a value therefor of $800 per acre, which produces a value for the Stanley Works property after the easement of $1,680,000.

In our judgment and opinion and considering all the facts and circumstances herein, we hold that the value of the conservation easement donated by petitioner to the HVA was $4,970,000. That amount reflects simply our mathematical calculation of the value of the easement after concluding, as we do, that the value of the Stanley Works property on June 10, 1977, before the donation in question, was $6,650,000.

Our calculation of the value of the easement is reflected below, along with the figures submitted therefor by each of the parties and their experts.

|  | Before value of property | After value of property[1] | Value of easement |
|---|---|---|---|
| Petitioner's tax return | - - - | - - - | $12,000,000 |
| Respondent's notice of deficiency | - - - | - - - | 619,700 |
| Petitioner's first value | $13,000,000 | $1,680,000 | 11,320,000 |
| Petitioner's second value | 5,394,000 | 1,680,000 | 3,714,000 |
| Petitioner's third value | 8,384,040 | 1,680,000 | 6,704,040 |
| Respondent's value[2] | - - - | 1,680,000 | 1,100,000 |
| Court's finding | 6,650,000 | 1,680,000 | 4,970,000 |

[1]As explained, the parties agree that the Stanley Works property after the easement was donated was suitable only for use as farmland, and the only evidence in the record concerning the value of the farmland suggests a value of $800 per acre, or a total value for the 2,100 acres involved herein of $1,680,000.

[2]As previously stated, respondent contends that the Stanley Works property had no potential to be used as the site for construction of a pumped storage plant, and respondent therefore did not offer evidence concerning the before value of the Stanley Works property.

Our conclusion regarding the value of the easement is based primarily on our finding that the Stanley Works property in 1977 did have a reasonable likelihood to be developed as the site for a pumped storage plant in the reasonably foreseeable future and on our consideration of the values submitted with respect thereto by petitioner's experts. Essentially, we have adopted petitioner's expert's third method of valuing the Stanley Works property, which is based on the average per-acre price for land purchased for a pumped storage plant. We have declined to add to that per-acre price, however, a 20-percent premium for assemblage.

*Increased Interest Rate on Substantial Underpayments*

The second issue presented by this case raises an issue of first impression.[10] Section 6621(d) imposes an increased

---

[10]*Solowiejczyk v. Commissioner*, 85 T.C. 552 (1985), presented a similar but different issue concerning whether the increased interest rate under sec. 6621(d)(3)(A)(i) could apply to tax deficiencies relating to years before 1982 in light of the fact that sec. 6659(c), which was incorporated into sec. 6621(d)(3)(A)(i), applies only to tax returns filed after Dec. 31, 1981. We held in *Solowiejczyk*, that the increased interest rate under sec. 6621(d)(3)(A)(i) could apply to a tax deficiency relating to 1978. *Solowiejczyk* did not address the question presented herein of whether the exception set forth in sec. 6659(c)(2) (as applicable to tax returns filed before

interest rate on underpayments of tax (or portions thereof) that are determined to be substantial and to be related to tax motivated transactions. The increased interest rate applicable under section 6621(d) is 120 percent of the interest rate otherwise applicable to income tax deficiencies under section 6621(b). Where applicable, the increased interest rate provided in section 6621(d) applies to all tax deficiencies outstanding after December 31, 1984. Deficit Reduction Act of 1984, sec. 144(c), Pub. L. 98-369, 98 Stat. 682.[11]

The transactions that generally will be considered to be "tax motivated transactions" under section 6621(d) are set forth in section 6621(d)(3)(A). Respondent asserts that subparagraph (i) of section 6621(d)(3)(A), describing a valuation overstatement, is applicable to the facts of this case.

---

1985), for property that had been held by the taxpayer for more than 5 years, was incorporated into the definition of a "valuation overstatement" in sec. 6621(d)(3)(A)(i).

[11]Sec. 6621(d) provides, in relevant part, as follows:

SEC. 6621(d). INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—

(1) IN GENERAL.—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the adjusted rate established under subsection (b).

(2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS.—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) TAX MOTIVATED TRANSACTIONS.—

(A) IN GENERAL.—For purposes of this subsection, the term "tax motivated transaction" means—

(i) any valuation overstatement (within the meaning of section 6659(c)),

(ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

(iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and

(iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period.

(B) REGULATORY AUTHORITY.—The Secretary may by regulations specify other types of transactions which will be treated as tax motivated for purposes of this subsection and may by regulations provide that specified transactions being treated as tax motivated will no longer be so treated. In prescribing regulations under the preceding sentence, the Secretary shall take into account—

(i) the ratio of tax benefits to cash invested,

(ii) the methods of promoting the use of this type of transaction, and

(iii) other relevant considerations.

(C) EFFECTIVE DATE FOR REGULATIONS.—Any regulations prescribed under subparagraph (A)(iv) or (B) shall apply only to interest accruing after a date (specified in such regulations) which is after the date on which such regulations are prescribed.

Section 6621(d)(3)(A)(i) does not define a "valuation over-statement." Instead, section 6621(d)(3)(A)(i) incorporates the definition of "valuation overstatement" that is contained in section 6659(c).

Petitioner argues that under the provisions of section 6659(c) (as applicable to tax returns filed before 1985) property held for more than 5 years, by definition, cannot be the subject of a valuation overstatement. Because petitioner has held the Stanley Works property for over 50 years, petitioner concludes that the increased interest rate applicable to valuation overstatements is not applicable. Respondent argues that under the provisions of section 6659(c), either as originally enacted or as amended in 1984, the definition of a "valuation overstatement" does not include any exception for property held for more than 5 years. Thus, respondent concludes that the understatement of tax attributable to the overvaluation of the Stanley Works property is subject to the increased interest rate of section 6621(d).

As originally enacted in the Economic Recovery Act of 1981, sec. 722(a), Pub. L. 97-34, 95 Stat. 172, section 6659(c) provided as follows:

SEC. 6659(c). VALUATION OVERSTATEMENT DEFINED.—
   (1) IN GENERAL.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).
   (2) PROPERTY MUST HAVE BEEN ACQUIRED WITHIN LAST 5 YEARS.—This section shall not apply to any property which, as of the close of the taxable year for which there is a valuation overstatement, has been held by the taxpayer for more than 5 years.

Section 6659(c)(1) and (c)(2) was made applicable only to tax returns filed after December 31, 1981. Economic Recovery Tax Act of 1981, sec. 722(a).

In 1984, section 6659(c) was amended (Deficit Reduction Act of 1984, sec. 155(c)(1)(A), *supra*), and paragraph (2) of subsection (c) (namely, the exception for property held for more than 5 years) was eliminated. Section 6659(c) in its amended form simply provides as follows:

SEC. 6659(c). VALUATION OVERSTATEMENT DEFINED.—For purposes of this section, there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be).

Section 6659(c) as amended was made applicable only to tax returns filed after December 31, 1984. Deficit Reduction Act of 1984, sec. 155(d)(2), *supra.*

As indicated above, petitioner contends that the original version of section 6659(c) (namely, the first version set forth above) applies to the tax deficiency determined in this case and therefore that the exception provided in paragraph (2) of original section 6659(c) for property held for more than 5 years is applicable.

On the surface, petitioner's argument is appealing. The reference in section 6621(d)(3)(A)(i) is simply to "any valuation overstatement within the meaning of section 6659(c)." Section 6659(c), as originally enacted, was entitled, "Valuation Overstatement Defined," followed by two paragraphs— the first of which contained a general explanation of a mathematical percentage that would constitute a "valuation overstatement," and the second of which contained the exception for property held for more than 5 years. Petitioner argues that because the title or heading of section 6659(c) uses the word "Defined," all statutory language that follows the heading is part of the "definition" and therefore that the provisions of both paragraphs (1) and (2) of section 6659(c) were incorporated into the cross-reference made in section 6621(d)(3)(A)(i) to valuation overstatements.

Petitioner also argues that it would be anomalous if the increased interest rate under section 6621(d) with respect to underpayments of tax attributable to tax motivated transactions was applicable to a tax underpayment in a situation where the addition to tax under section 6659 for valuation overstatements concededly did not apply. Lastly, petitioner argues that the internal structure of section 6659 does not support respondent's narrow interpretation of the definitional language of section 6659(c). Petitioner points out that specific limitations on the application of the section 6659 addition to tax are set forth in subsection (d) of that

section.[12] Petitioner therefore argues that if the exception for property held for more than 5 years was intended by Congress only as a limitation on the application of the addition to tax for valuation overstatements, the language reflecting that exception would have been included in section 6659(d), not in the definitional language of section 6659(c). For the reasons explained below, we do not agree with petitioner's interpretation of the relevant statutory provisions.

The general cross-reference (pertaining to valuation overstatements) in section 6621(d)(3)(A)(i) to subsection (c) of section 6659, without distinguishing between paragraphs (1) and (2) thereof, easily can be explained by the change in the language of section 6659(c) which occurred simultaneously with the enactment of section 6621(d). Section 6621(d) was enacted as part of the Deficit Reduction Act of 1984 (sec. 144(a), *supra*). As explained previously, section 6659(c) also was amended at the same time. Paragraph (2) of section 6659(c) was removed from the statutory language and old paragraph (1) of section 6659(c) was merged into the flush language of subsection (c). See Deficit Reduction Act of 1984, sec. 155(c)(1)(A), *supra*. Thus, in 1984 when Congress chose to incorporate into section 6621(d)(3)(A)(i) the definition of a valuation overstatement as found in section 6659, it simply referred to the language of section 6659 which contained that definition as it survived the 1984 amendment. More simply stated, in light of the 1984 amendment made to section 6659(c), there no longer was a paragraph (1) or (2) thereof to which reference could be made in section 6621(d)(3)(A)(i). We therefore reject petitioner's argument that in making reference to section 6659(c) in section 6621(d)(3)(A)(i), Congress intended to incorporate into that cross-reference not only the definitional language of section 6659(c) that survived the 1984 amendment thereto but also the language of paragraphs (1) and (2) of section 6659(c) as it existed before the 1984 amendment. We, however, do not base our conclusion herein solely or even primarily on the above analysis.

---

[12]Sec. 6659(d) provides as follows:

SEC. 6659(d). UNDERPAYMENT MUST BE AT LEAST $1,000.—This section shall not apply if the underpayment for the taxable year attributable to valuation overstatements is less than $1,000.

Petitioner's various arguments each start with the erroneous assumption that the original version of section 6659(c) controls herein because the amended section 6659(c) applies only to tax returns filed after 1984, and because the understatements of tax at issue herein relate to a tax return filed before 1985. Petitioner's assumption, however, neglects to recognize the effective date provision of the original section 6659(c). If one carries petitioner's assumption (that the original section 6659(c) applies herein) to the next logical step, petitioner's error becomes obvious.

If, as petitioner argues, the effective date provision of the 1984 amendment to section 6659(c) is incorporated into the cross-reference to that section in section 6621(d)(3)(A)(i), logic would dictate that the effective date provision of section 6659(c), as originally enacted in 1981, also would be incorporated into the cross-reference to that section in section 6621(d)(3)(A)(i). Thus, if petitioner's argument were correct, the increased interest rate provided under section 6621(d)(3)(A)(i) never would apply to tax returns filed before 1982 because, as explained, original section 6659(c) does not apply to tax returns filed before 1982. Such a result is contrary to the clear legislative purpose of section 6621(d). The effective date provision of section 6621(d) makes the increased interest rate thereof applicable to all interest accruing after December 31, 1984, *regardless of the date the tax return was filed*. H. Rept. 98-861 (Conf.), 1984-3 C.B. (Vol. 2) 1, 239; *Solowiejczyk v. Commissioner*, 85 T.C. 552, 556 (1985). We thus conclude that the only version of section 6659(c) that was incorporated into section 6621(d)(3)(A)(i) is that version which survived the 1984 amendment to section 6659(c). Since, as explained, that version has no exception for property held for more than 5 years, petitioner's holding of the Stanley Works property for many years has no bearing on the application of the increased interest rate under section 6621(d)(3)(A)(i).

Even if we were to agree with petitioner that the original version of section 6659(c) is the controlling language in deciding whether a valuation understatement occurred under section 6621(d)(3)(A)(i) with respect to tax returns filed before 1985, we still would reject petitioner's argument. Our

reading of section 6659(c) (as originally enacted[13]) supports our conclusion. In spite of the heading of that subsection, we think it clear that only paragraph (1) thereof contained the definition of a "valuation overstatement." Paragraph (2), by its terms, contained no language pertaining to the definition of a valuation overstatement, but only an exception to, or a limitation on, the application of the addition to tax for valuation overstatements. We emphasize that the heading of section 6659(c) is just that—a heading. Paragraph (1) thereof is a complete sentence and stands on its own as a definition of a valuation overstatement. Paragraph (2) of section 6659(c), by its terms, operates as a limitation not just on paragraph (1), but on all of section 6659. Thus, although we agree with petitioner that paragraph (2) of section 6559(c) might more appropriately have been made a part of subsection (d) of section 6659, than a part of subsection (c), that fact does not change our conclusion as to the purpose or nature of section 6659(c)(2).

Apropos to the instant question of statutory interpretation, the Supreme Court previously has said—

headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most general manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text. *United States v. Fisher*, 2 Cranch 358, 386; *Cornell v. Coyne*, 192 U.S. 418, 430; *Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 354. For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain. [*Brotherhood of Railroad Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528-529 (1947).]

See also *Application of Magnus*, 299 F.2d 335, 337 (2d Cir. 1962).

We agree with petitioner that it is somewhat anomolous that although both section 6621(d) and section 6659 apply

---

[13]Hereinafter, unless otherwise indicated, references to sec. 6659(c) will be to that section as it was enacted in 1981 and as it remained until it was amended in 1984.

to "valuation overstatements," under respondent's interpretation of the relevant statutory provisions (with which we agree), the increased interest rate under section 6621(d) will apply to the facts of this case but the addition to tax under section 6659 will not apply. That result, however, is explained by the different effective date provisions of the two statutory provisions and the different way in which the two effective date provisions operate.

Our conclusion that the definitional cross-reference in section 6621(d)(3)(A)(i) to section 6659(c) should not be interpreted to include the exception for property held for more than 5 years is further supported by the broad regulatory authority given to the Treasury under section 6621(d) and by the temporary regulations promulgated thereunder. Section 6621(d)(3)(B) gives the Treasury authority, by regulation, to add to the categories of transactions that, under section 6621(d), will be treated as tax motivated transactions. Under that broad grant of authority, on December 26, 1984, the Treasury promulgated Temporary Regulations, sec. 301.6621-2T, Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 (Dec. 28, 1984); 1985-1 C.B. 368, which address certain questions and answers that are likely to arise under section 6621(d). Question 2 of the temporary regulations asks, "What is a tax motivated underpayment?" The relevant portion of the answer provided in the temporary regulations makes it clear that Treasury concluded that the exception provided in section 6659(c) for property held for more than 5 years did not in any way limit the definition of valuation overstatements for purposes of section 6621(d). The relevant portion of the temporary regulations provides as follows:

Q-2. What is a tax motivated underpayment?

A-2. A *tax motivated underpayment is the portion of a deficiency (as defined in section 6211) of tax imposed by subtitle A (income taxes) that is attributable to any of the following tax motivated transactions:

(1) Any instance in which the value of any property, or the adjusted basis of any property, claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (i.e., a valuation overstatement *within the meaning of section 6659(c)(1)*); * * *

[ 49 Fed. Reg. 50391 (Dec. 28, 1984); 1985-1 C.B. 369. Emphasis added.]

By its specific reference in the temporary regulations only to paragraph (1) of section 6659(c), the Treasury clearly announced its decision to interpret the definition of valuation overstatements for purposes of section 6621(d) as excluding the language of paragraph (2) of section 6659(c) and made it clear that valuation overstatements would be subject to the increased interest rate of section 6621(d), regardless of how long the property had been held. The authority of the Treasury to so interpret section 6621(3)(A)(i) by regulation cannot seriously be doubted in light of the broad regulatory authority delegated to the Treasury under section 6621(d)(3)(B).

In light of the above analysis, we conclude that the exception in section 6659(c)(2) for property held for more than 5 years does not apply to valuation overstatements under section 6621(d)(3)(A)(i). We so hold. Because the easement in question was claimed on petitioner's tax return to have a value of $12 million and because that claimed value is in excess of 150 percent of the value we have determined therefor, the increased interest rate under section 6621(d) will apply to the underpayments of tax redetermined herein.

*Decision will be entered under Rule 155.*