T.C. Memo. 2003-176

UNITED STATES TAX COURT

ESTATE OF HELEN A. DEPUTY, DECEASED, WILLIAM J.
DEPUTY, CO-EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9308-01, 9309-01.        Filed June 13, 2003.

Albert L. Grasso, Donald J. Russ, Jr., and John P. Adams,

for petitioner.

Michael F. O'Donnell, Gregory J. Stull, and Thomas D. Yang,

for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  In these consolidated cases,[1] respondent

determined a $1,295,274 deficiency in estate tax and a $162,715

deficiency in gift tax.  The parties have resolved all issues

_____

[1] These cases were consolidated for purposes of trial,
briefing and opinion.

except for the fair market value of an interest in a closely held corporation that was included in decedent's estate as part of a family limited partnership.[2]

FINDINGS OF FACT

Helen A. Deputy (decedent) died on September 15, 1997, when her legal residence was in Elkhart, Indiana. William J. Deputy and Robert J. Deputy were appointed coexecutors of decedent's estate. William J. Deputy, as coexecutor of the estate, filed timely petitions with respect to respondent's determination of separate estate and gift tax deficiencies. At the time the petitions were filed, William J. Deputy resided in New Buffalo, Michigan, and Robert J. Deputy resided in Elkhart, Indiana.

Decedent was married to Sherrill S. Deputy. They had six sons, including William J. Deputy and Robert J. Deputy, the coexecutors of decedent's estate. On December 12, 1996, decedent formed a family limited partnership (Deputy FLP), retaining a 99-percent limited partnership interest and creating two 0.5-percent general partnership interests, one held by decedent and

---

[2] These cases involve the fair market value of interests in a closely held corporation transferred by gift during 1997 and another interest held by decedent through a family limited partnership at the time of her death, Sept. 15, 1997. The transferred interests were substantially smaller than the interest held by decedent. The parties have stipulated that the Court's decision with respect to the fair market value on Sept. 15, 1997, will bind them with respect to the 1997 gift tax values. Accordingly, we consider only the fair market value on Sept. 15, 1997.

one by her son William.  On May 31, 1997, decedent gave each of her six sons a 1-percent limited partnership interest in Deputy FLP.

On July 18, 1997, decedent transferred 5 of her 192.5 shares of Godfrey Conveyor Co., Inc. (Godfrey), to her grandson, Matthew Deputy.  The 5 shares represented 0.53 percent of the issued and outstanding shares of Godfrey.  On July 20, 1997, decedent transferred her remaining 187.5 of the issued and outstanding shares of Godfrey to Deputy FLP.

As of the date of decedent's death, September 15, 1997, there were 938 shares of Godfrey stock outstanding, which were held as follows:  553.5 shares (59.01-percent interest) by the Sherrill S. Deputy Trust; 187.5 shares (19.99-percent interest) by Deputy FLP; 117 shares (12.47-percent interest) by Robert J. Deputy; and the remaining 80 shares, 5 each (.53-percent interest), by 16 other Deputy family members (16 x 5 = 80). Decedent's six sons are the beneficiaries of the Sherrill S. Deputy Trust, and all six must consent to the sale of any Godfrey shares by the trust.

Godfrey was founded in Indiana during 1919 and engaged in the manufacture of coal-handling machinery and related products. Decedent's husband acquired a majority of Godfrey's shares during 1953, at a time when Godfrey's financial condition was poor.  He converted Godfrey to a manufacturer of recreational

aluminum pontoon boats sometime in the late 1950s. Godfrey expanded, in part, by acquisitions of companies in the same industry, during 1968 and 1974, and by expansion into the manufacture of aluminum fishing boats.

During 1987, Godfrey entered into a joint venture with Dynasty Boats, Inc., concerning the manufacture and sale of fiberglass boats and other marketing arrangements with outboard motor manufacturers. During 1993, Godfrey acquired Dynasty, Boats, Inc., and an outboard motor company. At the time of the acquisition, both companies were financially troubled. By 1994, and during the valuation period under consideration, Godfrey was the largest manufacturer of aluminum pontoon boats in the United States. Its main plant was in Elkhart, Indiana, with other manufacturing facilities located in Mississippi and Alabama.

During 1997, Godfrey employed approximately 750 people, and, with the exception of its truck drivers, it was a nonunion operation. Godfrey generally enjoyed good employee relations. Godfrey had a well-trained and qualified workforce, and employee reductions occurred only with respect to seasonal manufacturing needs. During 1997, Godfrey had a good reputation and was known for quality products, service, and moderate pricing. Merchandising was accomplished through a network of approximately 500 loyal dealers. As of 1997, Godfrey marketed several

successful product lines that were sold under legally protected trade names.

During the period 1981 through mid-November 1995, Godfrey experienced a consistent growth in net sales at a compounded rate that approached 18 percent. From 1991 through September 15, 1997, Godfrey experienced consistent growth in its profitability. On the basis of earlier planning, a 100,000-square-foot expansion of Godfrey's Elkhart facility was commenced during 1998. For its year ended December 31, 1996, Godfrey earned almost $2.5 million in net income from approximately $61 million in sales. For the years 1993 through 1997, Godfrey did not pay dividends to its shareholders. Although Godfrey's sales of pontoon boats increased by a few percentage points from 1996 to 1997, nationwide sales of pontoon boats decreased by 5 percent.

On June 17, 1998, the estate filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, in which the 187.5 Godfrey shares were reported as having a discounted fair market value of $2,246,500. The value reported was based on an appraisal prepared by Michael A. Dorman, which was attached to the Form 706. Respondent issued a May 8, 2001, notice of estate tax deficiency determining that the fair market value of decedent's interest in Deputy FLP was $4,835,300, as opposed to the $2,589,000 reported by the estate. On June 2, 2001, the estate filed an amended Form 706, in which the 187.5 Godfrey

shares were reported as having a fair market value of $1,941,000. The reduced value was based on a revised appraisal prepared by Michael A. Dorman, which was attached to the amended Form 706.

On May 26, 1998, a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, was filed for decedent's tax year ended December 31, 1997. In that return, $607,040 of taxable gifts was reported. Respondent issued a May 8, 2001, notice of gift tax deficiency, determining that the fair market values of decedent's gifts of interests in the Deputy FLP should be increased as follows:

| Date of Gift | Value Reported | Value Determined |
|---|---|---|
| May 31, 1997 | $79,620 | $127,680 |
| July 20, 1997 | 481,350 | 843,804 |
| July 20, 1997 | 62,020 | 74,515 |

Similar to the amendment of the estate tax return (Form 706), on May 21, 2001, an amended Form 709 was filed for decedent's tax year ended December 31, 1997. In that return, $570,570 of taxable gifts was reported. The reduction in the amount of gifts reported for the 1997 year was attributable to the revised appraisal reducing the value assigned to the interest in Godfrey.

OPINION

The controversy in these cases concerns the fair market value of an interest in a closely held family corporation that, in turn, is held by the same family's limited partnership. Because the largest asset of the partnership is an interest in a

closely held corporation that corporation's value as of decedent's date of death is key to our holding on valuation. The parties also disagree as to the types and amounts of discounts to be applied to the value found by the Court.[3] The evidence consists of a stipulation of facts, along with attached exhibits, and a transcript containing the testimony of one fact witness. In addition, each of the parties has offered an expert's opinion, ostensibly to assist the Court in its consideration of the facts and conclusion as to the fair market value of the controverted interest.

A. The Question of the Burden of Proof

In its posttrial brief the estate for the first time interposed section 7491[4] and argued that the burden of proof should shift to respondent with respect to the remaining valuation question. The following statement is at the heart of the estate's contention:

> It is respectfully submitted that the combined testimony of Mr. Deputy and Mr. Dorman[5] plus the Stipulation of Facts and the contents of the associated exhibits is credible evidence within the meaning of

---

[3] The parties have agreed to discounts with respect to the interest in the family limited partnership.

[4] All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[5] Mr. Deputy is one of the estate's coexecutors, and Mr. Dorman is the estate's expert witness.

Section 7491(a)(1) sufficient to shift the burden of proof to Respondent.

Section 7491(a)(1) provides that if, in any court proceeding, the taxpayer introduces credible evidence with respect to a factual issue relevant to ascertaining the taxpayer's liability for a tax (under subtitle A or B), the burden of proof with respect to such a factual issue will be placed on the Commissioner.

For the burden to shift to the Commissioner, however, the taxpayer must comply with the substantiation and record-keeping requirements of the Internal Revenue Code. See sec. 7491(a)(2)(A) and (B). In addition, section 7491(a) requires that taxpayers cooperate with reasonable requests by the Commissioner for "witnesses, information, documents, meetings, and interviews". Sec. 7491(a)(2)(B). Finally, the benefits of section 7491(a) are not available in cases of partnerships, corporations, and trusts unless the taxpayer meets the net worth requirements of section 7430(c)(4)(A)(ii). See sec. 7491(a)(2)(C). Taxpayers bear the burden of proving that these requirements are met. Higbee v. Commissioner, 116 T.C. 438 (2001); H. Conf. Rept. 105-599, at 240 (1998), 1998-3 C.B. 747, 994; S. Rept. 105-174, at 45 (1998), 1998-3 C.B. 537, 581.

Respondent argues that the estate failed to introduce evidence during the trial to show that the requirements of section 7491(a) were satisfied. Respondent also argues that the estate should not be allowed to initiate a burden of proof

question during posttrial briefing.  If the estate is allowed to raise the burden of proof question at this juncture, respondent contends that he will be subjected to surprise and prejudice.  See Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986).  Respondent also points out that he has not been afforded the opportunity to present evidence to counter the estate's unproven allegations that it has met the statutory requirements.  See Ware v. Commissioner, 92 T.C. 1267, 1268 (1989), affd. 906 F.2d 62 (2d Cir. 1990).

We agree with respondent that the estate's attempt to raise this matter in a posttrial brief constitutes surprise and is therefore untimely.

In addition, section 7491(a), as a prerequisite to the shifting of the burden of proof, requires the taxpayer to provide credible evidence.  Section 7491 does not define the term "credible evidence".  The legislative history underlying the enactment of section 7491 contains the explanation that

> Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness). A taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions, frivolous claims, or tax protestor-type arguments. The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief. If after evidence from both sides, the court believes that the evidence is equally balanced, the court shall find that the Secretary has not sustained his burden of proof.

H. Conf. Rept. 105-599, supra at 240-241, 1998-3 C.B. at 994-995.

In the context of the valuation issue presented in these cases, the question of who has the burden or proof is irrelevant. The parties have stipulated the operative facts and documents. Quantitatively, the parties' stipulation is the source of the vast majority of the facts predicated in our opinion. In addition to the parties' stipulation, during the trial, each party offered four items of documentary evidence, seven of which were received into the record of these cases. Finally, only one fact witness, coexecutor William J. Deputy, was called to testify. Most of the transcript consists of the cross-examination of the parties' tendered experts' opinion testimony on the question of value.

The parties were required to file simultaneous posttrial briefs. The estate's reply brief, filed in response to respondent's opening brief, contained no objections to respondent's extensive proposed findings of fact. Likewise, respondent's reply to the estate's opening brief contained only limited objections to the estate's proposed findings. In great part, the parties' posttrial briefing focused on the experts' opinions and their "spin" on the essentially agreed facts.

In these circumstances, the question of which party has or had the burden of proof has become wholly academic. In the context of these cases, there is no need to analyze or decide

whether the estate met the "credible evidence" requirement because, as a finder of facts, we consider essentially agreed underlying facts and look to the experts' reports for guidance in order to resolve the valuation issue.

B.  The Value of Godfrey on September 15, 1997

The parties have narrowed the focus of their controversy to the question of the value of a 19.99-percent interest in Godfrey, a closely held Deputy family corporation.  For purposes of the gift and estate tax provisions, the value of property transferred on a particular date provides the base upon which the tax rate is applied, after appropriate adjustments.  See secs. 2001, 2501(a)(1).  For purposes of the gift and estate tax property value is determined by considering the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts.  Sec. 20.2031-1(b) Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. The determination of the fair market value of property is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. Natl. Grocery Co., 304 U.S. 282, 294 (1938); Symington v. Commissioner, 87 T.C. 892, 896 (1986).

To determine the value of an unlisted stock, an actual arm's-length sale of a similar stock within a reasonable time before or after a decedent's date of death is indicative of its fair market value.  Ward v. Commissioner, 87 T.C. 78, 101 (1986). In the absence of arm's-length sales, fair market value represents the price that a hypothetical willing buyer would pay a hypothetical willing seller, both persons having reasonable knowledge of all relevant facts and neither person compelled to buy or sell.  Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989).  It is implicit that the buyer and seller would aim to maximize profit and/or minimize cost in the setting of a hypothetical sale.  Estate of Watts v. Commissioner, 823 F.2d 483, 486 (11th Cir. 1987), affg. T.C. Memo. 1985-595; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990).  Therefore, we consider the view of both the hypothetical seller and buyer. Kolom v. Commissioner, 644 F.2d 1282, 1288 (9th Cir. 1981), affg. 71 T.C. 235 (1978).

On the original estate tax return, the estate reported $2,246,500 as the discounted value of the Godfrey interest. After respondent determined that the discounted value of the Godfrey interest was $4,835,300, the estate, in an amended estate tax return, reported a reduced discounted value of $1,941,000.[6]

_____

[6] We note that values or discounts reported or claimed on an estate tax return may be considered admissions and, to some

(continued...)

For purposes of this controversy, the estate contends that the value reported on the amended returns is correct. Respondent relies on his expert's discounted value of $4,608,825, which closely approximates the $4,835,300 value determined in the notice of estate tax deficiency.

As already discussed, for all practical purposes, the facts in the record are not in dispute. The parties' experts have used diverse judgmental factors which resulted in differing values' being advanced by the parties. Accordingly, we proceed to examine the parties' experts' opinions and methodologies.

A court, in approaching expert opinion evidence, is not constrained to follow the opinion of any expert when the opinion is contrary to the court's own judgment. A court may adopt or reject expert testimony. Helvering v. Natl. Grocery Co., supra at 295; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285. Valuation cases are usually

---

[6](...continued)
extent binding or probative, restricting an estate from substituting a lower value without cogent proof that those admissions are wrong. Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989); Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425; Estate of McGill v. Commissioner, T.C. Memo. 1984-292. In that regard, the estate used the same expert for purposes of the values claimed in the original and amended estate tax returns. Ultimately, the valuation question we have considered was framed by a factual record and the parties' arguments in connection with their respective experts' reports. The value we have decided was larger than the value reported in the original estate and gift tax returns, and so there was no need to analyze whether the estate should have been bound by the latter values.

fact specific and are relied on by litigants and courts for generalized guidance, but they do not establish bright-line rules for valuation; i.e., they do not establish specific percentage discounts to be applied under particular factual circumstances.

The estate's expert, Mr. Dorman, mentioned three different approaches in valuing the common stock of Godfrey, to wit: "Market Comparison Approach", "Adjusted Net Book Value Approach", and "Capitalized Earnings Approach".[7]  Although his report contains some discussion of all three methods, ultimately, he relied solely on the net asset approach.

Mr. Dorman rejected the market approach because he could not find what he believed to be comparable companies.  Of six comparable companies, he noted that four, unlike Godfrey, reported losses.[8]  The remaining two were rejected because he "determined that using only the remaining two public companies, Brunswick Corp. and Fountain Powerboat Ind., Inc., would not provide reliable comparable data to arrive at a market measure of value."  Mr. Dorman, even though he labeled the six companies

---

[7] For convenience, we use "market approach", "net asset approach", and "income approach" instead of "Market Comparison Approach", "Adjusted Net Book Value Approach", and "Capitalized Earnings Approach", respectively.

[8] We find Mr. Dorman's reason for abandoning the comparable or market approach to be somewhat curious because, in spite of the "comparable companies" losses, respondent's expert's calculations with similar comparables resulted in the potential for values that were two to three times the value reached by use of the approach advanced by Mr. Dorman.

"comparable", did not explain with specificity why the companies with losses or the remaining limited universe would not be "reliable".

Mr. Dorman concluded that Godfrey's adjusted net book value was $17,341,379, as of September 15, 1997. That number is close to Godfrey's unadjusted balance sheet total shareholders' equity, which was $17,160,705 on the valuation date. Mr. Dorman started with the shareholders' equity and deducted $126,806 to account for the partial year. Mr. Dorman explained the deduction as being attributable to an expectation that shareholders' equity would decrease by the end of the year.[9] We could find no foundation for such a deduction. He then converted the book values to fair market values, resulting in a $2,392,916 increase or excess of fair market value over book value. Mr. Dorman then formulated a $1,919,869 deduction for something he labeled "Environmental Liabilities". Finally, he deducted $165,566 for Federal and Indiana tax (ostensibly for the capital gains on liquidation and/or sale of the assets).

With respect to Mr. Dorman's net asset approach, we found his reasoning and/or basis for his conclusions in support of the adjustments (reductions) to be inadequate and without meaningful explanation.

---

[9] In the use of a net asset valuation approach, it would be irrelevant that shareholders' equity decreases <u>after</u> the valuation date.

As a third approach, Mr. Dorman explained that the income approach is used to determine the fair market value of an ongoing business enterprise on the basis of its earning capacity.  Mr. Dorman provided the caveat that Godfrey's management made representations concerning future operating outcomes, but he did not explain or provide those representations.  He then annualized the September 30, 1997, earnings, which he found to be $3,085,615.  The 4 preceding years' earnings were then weighted, giving the most emphasis to 1996 and least to 1993.  Mr. Dorman ignored the 1997 results "due to the cyclical nature of the business" and arrived at normalized annual earnings of $1,846,793.  If Mr. Dorman had included the annualized amount for 1997 and used a similar approach to weighting the income results, normalized earnings would have been approximately $2,259,334 or 22 percent larger.

Next, a capitalization rate was selected.  This rate should constitute a reasonable rate of return.  Mr. Dorman referenced the Dun & Bradstreet's 1996-97 median after-tax return on net worth for the boat building and repairing industry, which was 12.9 percent.  He then explained that an investor would want to receive a rate of return at least 12.9 percent; but if another investment alternative would produce a better return with the same degree of risk, the investor would want a better return than the industry average.

After discussing the 12.9-percent median industry return, Mr. Dorman switched to a customized approach to derive a capitalization rate. He started with a 6.14-percent rate of return on 5-year U.S. Treasury bonds as a riskless rate. He then added to the 6.14-percent base, increases of 7.9 percent, 5.78 percent, and 3 percent for "Premium for Equity", "Premium for Small Stock", and "Company/industry", respectively. Those increases are generally explained as excess of return of common stock over bonds; excess of return of small capitalization companies over stock exchange common stock; and finally an increased risk factor based on either industry or company conditions.

The add-ons to the 6.14-percent return for a riskless investment increased the capitalization rate to 22.85 percent, which Mr. Dorman reduced by 5.5 percent to account for Godfrey's growth, finally arriving at a 17.5-percent capitalization rate (rounded to the nearest 0.5 percent). Using the 17.5-percent rate and his $1,846,793 annualized earnings computation, Mr. Dorman's analyses result in a capitalized value for Godfrey of $10,553,101, which is almost $7 million or 40 percent less than Godfrey's net assets or ostensible liquidation value.

Ultimately, Mr. Dorman discarded the income approach and concluded that Godfrey had a fair market value of $17,341,379, on the basis of his net asset approach. Mr. Dorman also applied a

discount to that value to arrive at the per-share value of the interest in question.[10]

Respondent's expert, Francis X. Burns, also considered three approaches to value and concluded that Godfrey's fair market value on September 15, 1997, was $30,740,869. Mr. Burns explained that the income, market, and net asset approaches are used to value a business. Messrs. Burns and Dorman generally agree about the three methodologies normally used to value a closely held business.

For purposes of the income approach, Mr. Burns attempted to normalize the historical earnings to reflect the expectations for Godfrey's future profits. He referred to the National Marine Manufacturers Association's compiled statistics. They reflected that a general recession occurred during the years 1990 through 1994 and had a profound effect on the boating industry. From this premise, Mr. Burns concluded that Godfrey's 1990 through 1994 earnings "would likely understate the company's expected future earnings as of 1997."

Mr. Burns calculated the 1997 normalized earnings at $3,077,161. We note that Mr. Burns's figure is only $8,454, or less than 1 percent, different from Mr. Dorman's $3,085,615 figure for 1997 normalized earnings. Because he concluded that

---

[10] The amount of the discount to be applied is discussed later in this opinion.

the 1990-94 earnings were lower than normal, Mr. Burns used a 3-year spread of 1995-97, with 1997 more heavily weighted. In this way, Mr. Burns arrived at normalized 1995-97 earnings of $2,551,487 per year.

In computing a capitalization rate, Mr. Burns, in a manner similar to Mr. Dorman's, started with a 6.56-percent riskless rate on U.S. Treasury bonds and added a 7.50-percent premium for equity and a 5.78-percent premium for small stock. Finally, he made an industry-specific reduction of 5.20 percent to arrive at a total of 14.64 percent. From the 14.64 percent, Mr. Burns deducted 4.63 percent to reflect Godfrey's growth, resulting in a 10.01-percent capitalization rate. We note that Mr. Dorman and Mr. Burns started with comparable rates for U.S. Treasury bonds and made, for the most part, similar categorical adjustments, as follows:

| Item | Mr. Dorman<br>Percent (%) | Mr. Burns<br>Percent (%) |
|------|-----------|-----------|
| Treasury bond rate | 6.14 | 6.56 |
| Premium for equity | 7.90 | 7.50 |
| Premium for small stock | 5.78 | 5.78 |
| Company/industry | 3.00 | (5.20) |
| Total | 22.82 | 14.64 |
| Less: Growth | (5.50) | (4.63) |
| Capitalization rate | [1]17.50 | 10.01 |

[1] Rounded to the nearest 0.5.

Accordingly, the major difference between the experts' approaches resides in the "Company/industry" adjustment. Mr.

Burns derived his 5.2-percent Company/industry reduction directly from a data base published by Ibbotson Associates, which suggests a 5.2-percent reduction for companies in the "Ship and boat building and repairing" category.  This obviously translates into a premium for that industry's category.

Mr. Dorman, on the other hand, listed six general categories and the fact that Godfrey was a small company to increase the risk factors and arrive at his 3-percent adjustment in the Company/industry category.  That, of course, translates into a discount for the industry category.  Here again, Mr. Dorman's explanation for his adjustment is without specifics.

The estate argues that the 5.2-percent Company/industry reduction that Mr. Burns obtained from the Ibbotson Associates data base was inappropriate because the data, to some extent, were derived from years after 1997.  Mr. Burns explained that such information was not available before 2001 and the data base included the years 1996 through 2001.  In defending his use of that data base, Mr. Burns explained that industry risk tends to trend and does not generally have spikes.  In addition, Mr. Burns compared some "betas" of comparable publicly traded companies and found that they had a composite 5-percent industry risk premium, which supports the 5.2-percent premium Mr. Burns used.

Ultimately, we accept Mr. Burns's explanation that there is a premium in the industry, on the basis of his analysis of publicly held companies. We note that there is no meaningful universe of information available for closely held companies or Godfrey's particular boat manufacturing niche. Although the 5.2-percent premium was based on some data from years subsequent to 1997, we are satisfied that the 5.2 percent is within a reasonable range. In part, we base our conclusion on Godfrey's tendency to generally outperform the industry and economy, so that the 5.2-percent premium may be on the conservative side. Moreover, we are more comfortable with Mr. Burns's methodology, for which he has provided explanations supporting his conclusions and assumptions. On the question of industry risk, Mr. Dorman's figures are without empirical support or explanation and appear to be purely subjective.

Mr. Burns used a 10.01-percent discount rate, which translates into an approximately 9.9900099-percent capitalization rate. That capitalization rate produced an income approach value of $30,740,869 when multiplied by Mr. Burns's $3,077,161 normalized earnings for 1997. Likewise, Mr. Dorman, by using a 17.50-percent discount rate, which translates into a 5.7142857-percent capitalization rate, produced an income approach value of

$10,553,101 when multiplied by his $1,846,793 normalized (indexed) earnings for 1993 through 1996.[11]

Mr. Dorman, however, abandoned his income approach value and market (comparative) approach and relied solely on his net asset approach value of $17,341,379.  Conversely, Mr. Burns did not use the net asset approach because Godfrey had "been engaged in the manufacture and marketing of boats since 1958 * * * [and] is clearly an established and successful operating company." Because of that fact, Mr. Burns concluded that valuation of Godfrey's assets is "inappropriate because it implies that the company's value is limited to its tangible assets."

Mr. Burns also performed a market approach analysis and located 15 public equity companies in the same general industry as Godfrey.  He noted that many of the companies were also listed in a 1995 independent appraisal seeking to establish valuation multiples for Godfrey.  Mr. Burns admits that none of the 15 are "perfect comparables", but he contended that they are sufficiently similar to "indicate acceptable valuation multiples".  Using those multiples, Mr. Burns's market approach resulted in a value range for Godfrey of $34,700,000 to $51,500,000.  Mr. Burns also noted that Godfrey's profitability

---

[11] It is conceptually incongruent that an income approach would produce a $10,553,101 value, approximately 40 percent less than a $17,341,379 net value approach for a manufacturing company with a sustained successful income and profit history.

and debt levels relative to the guideline companies supported use of the median multiples he used, and that Godfrey had generally higher profitability and less debt than the guideline companies. Ultimately, Mr. Burns did not rely on the market approach but relied on his income approach value of $30,740,869, which was based only on 1997 earnings.

Generally, we agree with Mr. Burns that an asset value approach is inappropriate in valuing a long-established, financially successful operating company. The estate argues that it was customary for businesses in this industry to be acquired for net asset value. In that regard, William J. Deputy, who was the chief operating officer of Godfrey at the time of trial, testified that he had been involved in entity purchases in the boating industry where the business acquisition was for an amount approximating net asset value. Those acquisitions by Godfrey, however, involved companies that were financially troubled. Considering Godfrey's sustained financial success, the use of net asset value to acquire financially troubled companies is not analogous or helpful in the circumstances we consider.

In an attempt to minimize Godfrey's financial success, the estate argued that Godfrey did not have any intangible values attributable to patents or workforce. Admitting that Godfrey had engineering drawings and design formulas, the estate also contended that competitors could easily copy the design and

eliminate any advantage that Godfrey had. The estate's arguments, however, do not explain away Godfrey's long-established financial successes, good worker relationships, extensive and loyal dealer marketing relationships, and good reputation for product and service. Although neither party attempted to isolate or separately value those aspects, they represent some of the reasons for Godfrey's past success and, likewise, reasons for the potential for future success. The long-established ability of the entity to earn income and profit render inappropriate the use of a net asset approach to value Godfrey.

Accordingly, like Mr. Burns, we give no weight to the net asset approach in considering the value of Godfrey. We also generally agree with Mr. Dorman's view that the comparables were not a good fit with this company. Similarly, Mr. Burns did not rely on or factor in the market approach in reaching his value for Godfrey.

It would appear that the income approach is the best approach for valuing Godfrey, a long-established, financially successful, closely held operating company that has shown consistent profit and growth. In that regard, we adopt Mr. Burns's 10-percent discount rate, which translates into a 10-percent capitalization rate. We do not, however, adopt the normalized value approaches adopted either by Mr. Burns or Mr.

Dorman.  Instead, we believe that the normalized value lies somewhere between the two approaches.

In particular, Mr. Burns used the three most current years, which left out the reduced income levels occurring from 1990 through 1994.  Ultimately, Mr. Burns relied solely on normalized 1997 earnings to calculate value.  Conversely, Mr. Dorman emphasized the recessionary period by using a 4-year pattern and leaving out the income increases in the 1997 year.  Using Mr. Dorman's annualized 1997 income (which was almost the same as Mr. Burns's figure) and incorporating the figures for the 3 preceding years, we decide that $2,400,000 represents the normalized earnings for Godfrey, as follows:

| Year | Income | Weight | Weighted Income |
|------|--------|--------|-----------------|
| 1997 | $3,085,615 | 4 | $12,342,460 |
| 1996 | 2,497,222 | 3 | 7,491,666 |
| 1995 | 1,082,997 | 2 | 2,165,994 |
| 1994 | 1,958,688 | 1 | 1,958,688 |
| Total | | | 23,958,808 |

Divided by weight factor of 10 and rounded    2,400,000

Using a capitalization rate of 10 percent, we find that Godfrey's undiscounted fair market value was $24 million as of September 15, 1997.

## C. Discounts To Be Applied

Respondent's expert, Mr. Burns, concluded that no minority discount should be used to compute decedent's interest in the property.  He reached that conclusion on the basis of his

expedient logic that the exclusive use of capitalized earnings and the income method in the valuation would result in treating all interests in the entity equally. In other words, he concluded that minority interests would receive the same percentage return on their investment as a majority interest. Mr. Burns did, however, employ a 25-percent marketability discount. To compute the discounted value, Mr. Burns began with his $30,740,869 income method valuation of Godfrey and calculated that a 19.99-percent interest resulted in an undiscounted value of $6,145,100. After applying a 25-percent marketability discount of $1,536,275, he arrived at his discounted fair market value of $4,608,825.

Mr. Burns relied on two different studies that surveyed restricted stock transactions of otherwise publicly traded stock. Based on those studies and his analysis, Mr. Burns concluded that a 25-percent marketability discount was appropriate for the 19.99-percent interest in Godfrey. One study, which was conducted by FAIR MARKET VALUE Opinions, Inc., surveyed restricted stock transactions from 1979 through 1992 and resulted in a mean discount of 23 percent. A second study, conducted by Management Planning, Inc. (MPI), with respect to restricted stock transactions occurring from 1980 through 1995, resulted in an average discount of 19.4 percent for companies with revenues ranging from $50 million to $100 million. In the MPI study, the

share prices paid in private placements of restricted stock were compared with the same company's freely traded market price. After considering those studies, Mr. Burns arrived at a 25-percent discount to account for "the fact that an interest in Godfrey * * * would likely not be able to be sold immediately."

The estate's expert, Mr. Dorman, reached the conclusion that the 19.99-percent interest in Godfrey should be discounted by 44 percent to account for the minority interest and marketability limitations. He calculated a discounted value of $1,941,000 by dividing his $17,341,379 adjusted net asset value by 938 (the number of Godfrey shares outstanding) to arrive at an $18,488-per-share value. He then multiplied the per-share value by 187.5 (the number of shares being valued) to arrive at an undiscounted value of $3,466,427. By applying the 44-percent discount ($1,525,228) for lack of marketability and the minority interest, Mr. Dorman arrived at a discounted value of $1,941,199, which he rounded to $1,941,000.

Mr. Dorman's combined 44-percent minority interest and lack of marketability discount was derived by use of a matrix table devised by his company. The table is divided into six rating factors, which Mr. Dorman believes "replicate an investor's decision process." The table has values (amounts of percentage discount) assigned to each of five categories (descending from good to poor) for each of the six factors. The matrix also has

built-in indexing to place more emphasis on some categories over others.  For purposes of our analysis and clarification, we replicate the table used by Mr. Dorman with the final column showing the percentage discount he assigned with respect to the 19.99-percent interest in Godfrey:

| | Good | Above Average | Average | Below Average | Poor | Dorman's Rating |
|---|---|---|---|---|---|---|
| 1. Information availability and reliability | 1 | 2 | 3 | 4 | 5 | 2 |
| 2. Investment size | 1 | 2 | 4 | 6 | 8 | 6 |
| 3. Company outlook, management & growth potential | 2 | 4 | 6 | 8 | 10 | 4 |
| 4. Ability to control | 0 | 5 | 10 | 15 | 20 | 10 |
| 5. Any restrictions on transferability, anticipated holding period and company's redemption policy | 2 | 5 | 8 | 11 | 14 | 8 |
| 6. Dividend payout history and outlook | 2 | 5 | 8 | 11 | 14 | 14 |
| Total | 8 | 23 | 39 | 55 | 71 | 44 |

(Column header spanning: Percent(%) of Discount Based on Condition)

Mr. Dorman's report also contained references to discount studies as background and/or to support his own approach.  In regards to the marketability discounts, Mr. Dorman discussed various studies, including some that were relied on by Mr. Burns. The majority of the studies referenced by Mr. Dorman, however, resulted in marketability discounts ranging from approximately 26 percent to 45 percent, with most in the 32- to 35-percent range. Most of the data for the studies referenced by Mr. Dorman were

not contemporaneous to the 1997 valuation year because they were gathered in the mid to late 1960s and early 1970s.

Mr. Dorman also provided a brief discussion on minority discounts which concluded with the statement that an analysis of "Tax Court cases between 1950 and 1982 * * * disclosed a median 25-percent minority discount." Following this general discussion of marketability and minority discounts, Mr. Dorman, in an attempt to summarize his commentary, referenced a study by Professor Steven E. Bolten which concluded that on the basis of other studies in existence as of 1984, average discounts for marketability and minority were 39.86 percent and 29.37 percent, respectively.

Neither party's expert attempted to persuade us to rely or not to rely on the various studies he referenced. Mr. Dorman's discount approach focuses more specifically on Godfrey's unique attributes and therefore provides a more direct approach to evaluate the interest in Godfrey. Additionally, we do not accept respondent's expert's position that no minority discount should apply where value is estimated by means of an income approach. Although Mr. Dorman's approach is more subject specific, no foundation or background is provided to support the indexing in each category in the matrix. In that regard, the matrix was created by Mr. Dorman's company and is obviously subjective. Finally, as explained below, we do not agree with parts of Mr.

Dorman's analysis and conclusions.  The divergent valuation
approaches by the parties' experts force the Court to choose one
method over the other without necessarily fully accepting that
method or approach.  Accordingly, we use Mr. Dorman's table
merely as a guide to assist in our analysis of the facts
presented in the record of these cases.

The first category of the matrix rates the subject's
financial information availability and reliability with a range
from one discount point for the best to five discount points for
the poorest condition.  Mr. Dorman selected an above-average 2-
percent rating, noting that Godfrey had available financial
statements that were audited by independent public accounts.  It
is enigmatic that Mr. Dorman would assign a less than favorable
rating under these circumstances.  Moreover, there is no reason
provided as to why any discount should be attributable here,
where the subject has ample and quality financial information
available.  Accordingly, we do not attribute any discount to this
factor.

The scale provided to rate investment size is an arithmetic
progression by 2, starting with one and proceeding to eight
discount points.  Mr. Dorman explains that this adjustment is
made to reflect the premise that the larger the necessary capital
investment, the less likely a buyer would be willing to place it
at risk.  Because Mr. Dorman reached a $3,466,000 undiscounted

value for the 187.5 shares in Godfrey, he considered the investment quite large and therefore assigned six discount points to this aspect. We view this aspect as one of the considerations associated with the risk factor in investing in a minority interest in a closely held family corporation. It would be reasonable to assess six discount points for this factor.

The third category concerns Godfrey's financial outlook, management, and growth potential, and the scale is another arithmetic progression by 2. However, it starts with 2 and proceeds to 10 discount points. Here Mr. Dorman indicates that Godfrey has had some sales fluctuation, but that operating expenses have shown continuous and steady decline, and that the short-term financial information indicates an improving trend. The record here reflects a much more positive picture of Godfrey's financial record and prospects. Accordingly, we consider Mr. Dorman's evaluation to be too conservative.

From another perspective, the financial outlook category should ostensibly be addressing the potential for return on invested capital. In that regard, the sixth category of the matrix more directly addresses that aspect and assigns as much as 14 discount points for that aspect. The third category appears, in that respect, to be a duplication. Mr. Dorman has given an "above average" rating, assigning 4 discount points to the third

category.  In any event, Godfrey's financial picture is such that we would assign no discount for that aspect.

Ability to control is the fourth category, and Mr. Dorman assigns a median discount of 10 in an arithmetic progression by 5, ranging from 0 to 20.  His reasoning is that the 187.5 shares "represents 20 percent of the outstanding common stock, and is therefore the second largest holding out of approximately twenty shareholders."  He concludes that the investor would not have control but "would enjoy swing power, and have a strong voice in the day-to-day operations and decision making of the company." We agree with Mr. Dorman's use of 10 discount points for lack of ability to control.

In the fifth category, which concerns restrictions on transfer and anticipated holding period, Mr. Dorman selected a median 8 discount points in an arithmetic progression by 3, ranging from 2 to 14.  His conclusion is based on a holding period of 5 years or more.  Mr. Dorman stated that "To the best of * * * [his] knowledge at the present time, there is no likelihood that Godfrey * * * will be sold within the foreseeable future."  We agree that there would be restrictions and possible delay in a sale of an interest in a family-owned entity as opposed to a publicly traded stock.  The record before us, however, does not reflect that the holding period would be extended for 5 years or more, or that there are any particular

difficulties in connection with the Deputy family. Accordingly, five discount points would be more appropriate to reflect the restriction situation in these cases.

Finally, the sixth category, which addresses dividend payout history, seems to address the return on capital factor. In this category, Mr. Dorman selected the poorest rating of 14 discount points from an arithmetic progression by 3, ranging from 2 to 14. His reason for the rating is that Godfrey has not paid any dividends and it is unlikely that any will be paid in the future. However, the actual payment of dividends is not the sole measure. The potential to pay dividends must also be considered. A return may also be expected in the form of increase in the value of the investment or potential for capital gain. In other words, prospective earning power is important. See sec. 20.2031-2(f), Estate Tax Regs.; Rev. Rul. 59-60, 1959-1 C.B. 237.

Mr. Dorman's analysis completely ignores any potential for gain due to increase in value. Godfrey's financial performance and future prospects would likely result in an increase in the investment value. The lack of dividends, when factored with the prospect of capital appreciation, would place Godfrey's return potential more in the middle range. Accordingly, 8 discount points would seem a better match than the 14 discount points attributed by Mr. Dorman to this aspect.

Using the matrix as a guide, we would have arrived at a sum of 29 percent after considering the six factors. Factoring in the studies cited in the reports of the experts, considering the record in these cases, and recognizing the imprecise nature of the process in which we are engaged, we hold that a 30-percent discount is appropriate to reflect the lack of marketability and minority discounts connected with the 187.5 shares of Godfrey. Accordingly, we hold that the 187.5 shares of Godfrey had a discounted value of $3,358,209[12] on September 15, 1997, the date of decedent's death.

To reflect the foregoing,

Decisions will be entered

under Rule 155.

---

[12] Fair market value of Godfrey of $24,000,000, divided by 938 outstanding shares equals $25,586.35 per share, times 187.5 shares equals $4,797,441, less 30 percent ($1,439,232) equals $3,358,209.