T.C. Memo. 2015-134

UNITED STATES TAX COURT

ESTATE OF JOHN A. PULLING, SR., DECEASED,
JOHN A. PULLING, JR., PERSONAL REPRESENTATIVE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1660-09.                    Filed July 23, 2015.

Thomas R. Bolf, for petitioner.

John R. Bampfield, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  Respondent determined a deficiency of $1,155,065 in

the Federal estate tax of the Estate of John A. Pulling, Sr. (estate).  After

[*2] concessions,[1] the sole issue for decision is the total fair market value of three parcels of land (estate's property) included in the value of the gross estate.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. John A. Pulling, Sr. (decedent), died on April 17, 2005, and was a resident of Florida at that time. Decedent's will was admitted to probate in Florida. John A. Pulling, Jr. (Mr. Pulling), decedent's son, is the personal representative of the estate and was a resident of Florida when the petition was filed.

I.    Background

The issue in this case revolves around five contiguous parcels of land in Collier County, Florida:  the three parcels of the estate's property and two larger parcels (TCLT's property) owned by the Temple Citrus Land Trust (TCLT), in which the estate held a 28% interest at the date of death. The five parcels contain a total of 130.84 acres, all of which was zoned agricultural. The only legal access to this entire block of properties is from Airport Pulling Road, to the west, via

---

[1] The parties have stipulated a variety of issues, as described in their stipulation of settled issues and two supplemental stipulations of settled issues. Additionally, on brief respondent conceded that the fair market value of the estate's interest in the property at 630 Fifth Avenue was $670,000.

**[\*3]** Willow Park Drive, a two-lane paved road that cuts across part of TCLT's property.

### A.   TCLT

On June 1, 1971, decedent, his friend Miles Scofield, and various unrelated parties came together to form TCLT. Decedent began with a 25% interest and Mr. Scofield with a 20% interest. Mr. Scofield served as TCLT's trustee until he stepped down in 1992 when he was succeeded by Mr. Pulling. Pursuant to TCLT's trust agreement, Mr. Pulling then had the power to deal with TCLT's assets but only when authorized by persons holding a combined ownership interest of at least 51%. At some point, WCI--the owner of a development to the east of TCLT's property--offered to purchase TCLT's property as part of its development plan. TCLT declined the offer.

During 1971-1992 the ownership interests in TCLT were fluid, and decedent's ownership interest fluctuated between 25% and 38.9%.

As of 1992 the ownership interests in TCLT were as follows:

**[*4]**

| Owner | % Interest |
|---|---|
| Decedent | 38.90 |
| Miles Scofield | 28.90 |
| Lucy Pulling Finch | 12.35 |
| John A. Pulling, Jr. | 11.10 |
| Lucy Pulling Finch, Trustee | 2.50 |
| Michelle McCauley, Trustee | 2.50 |
| John L. Finch, Sr. | 1.25 |
| William J. McCauley | 1.25 |
| Michelle McCauley | 1.25 |

In 2000 the Scofield family formed the Scofield Temple Groves Partnership (STGP), and Mr. Scofield's 28.9% interest in TCLT was transferred to STGP. In January 2005 decedent distributed a 10.9% interest in TCLT among various of his family members. Afterwards, the ownership interests in TCLT were as follows:

[*5]

| Owner | % Interest |
|---|---|
| STGP | 28.900 |
| Decedent | 28.000 |
| Lucy Pulling Finch | 13.600 |
| John A. Pulling, Jr. | 11.100 |
| Peter & Jean McCauley | 3.500 |
| Lucy Pulling Finch, Trustee | 2.500 |
| Michelle McCauley, Trustee | 2.500 |
| William J. McCauley | 2.125 |
| Michelle McCauley | 2.125 |
| Mariaellena McCauley | 1.250 |
| Steven McCauley | 1.250 |
| Kenneth McCauley | 1.250 |
| John & Marsha Pulling | 1.000 |
| Carol Pulling McCauley | 0.900 |

The ownership interests then remained the same up through the date of decedent's death. Over 50% of the ownership interests in TCLT are held by members of the Pulling family.

On the date of decedent's death TCLT owned two parcels of real estate: a 60.84-acre tract (parcel 1) and a 48.48-acre tract (parcel 2). These two parcels were worth $150,575 per acre on the date of death. Historically, these parcels

**[*6]** have been used for the cultivation of citrus fruit. TCLT also owns a store on parcel 1 that sells fruit from the citrus groves as well as other goods and produce.

### B. The Estate's Property

The estate's property comprises parcel 3, parcel 4, and parcel 5 in Collier County, Florida. Parcel 3 is a narrow 4.62-acre rectangular tract of land. Parcel 4 is a 6.9-acre tract with a sideways "T" shape. Parcel 5 is a roughly square 10-acre tract.

Parcel 3 abuts TCLT's parcel 2 to the north; parcel 4 to the east; and a low-income rental property to the south. To the west it is adjacent to Airport Pulling Road but is separated from the road by a canal and, because of restrictions under the Collier County Growth Management Plan and the Land Development Code, lacks direct access to the road. The only way to access a public right-of-way from parcel 3 would be by obtaining an easement through an adjacent parcel.

Parcel 4 abuts parcel 2 to the north; a parcel owned by Mr. Pulling to the east; the low-income rental property to the south (except for the easternmost portion, which extends down to abut a parcel owned by the Collier County School Board); and parcel 3 to the west. Parcel 4 also lacks access to a public right-of-way and would require an easement through an adjacent parcel.

**[*7]** Parcels 3 and 4 are undeveloped and have been used, historically, as a tree and plant nursery. Development of either of these parcels on its own faces significant obstacles. This difficulty is due, in part, to their lack of legal access to a road but also to their narrowness in relation to their frontage width. A residential development requires certain setbacks and a road right-of-way that, when combined with the narrow shapes of the parcels, would leave very little land available for residential units. Adding drainage for the properties would reduce the available land even further. As a result, neither parcel 3 nor parcel 4 would be economically feasible to develop unless they were first combined with other adjacent parcels.

Parcel 5 abuts parcel 2 to the north; land owned by unrelated parties to the east; the Collier County School Board's land to the south; and Mr. Pulling's land to the west. Although there is a four-lane road on the school board's land just south of parcel 5, it is restricted to school-related traffic. Consequently, parcel 5 has no direct access to a public right-of-way, and the only physical access is through unpaved service roads on TCLT's property. Parcel 5 is undeveloped and has also been used by Mr. Pulling as a tree and plant nursery. Parcel 5 has no adjacent utilities nor easements for utilities from the nearest roads although it has

[*8] water onsite.  Because of the lack of access and utilities, development of parcel 5, on its own, is similarly not economically feasible.

II.    2004 and 2011 Appraisals

In 2004 Mr. Pulling hired Raymond E. Carroll to appraise parcels 1 through 5 in connection with decedent's January 2005 gift.  Mr. Carroll completed his report on December 1, 2004 (2004 report).  The 2004 report was based on a boundary survey that Mr. Pulling provided, which treated parcels 1 through 5 as if they were a single large tract and valued parcel 3 at $990,000, parcel 4 at $130,000, and parcel 5 at $1,250,000.

The estate later hired Mr. Carroll to appraise parcels 3 through 5 as an expert witness in this case.  Mr. Carroll prepared an appraisal for parcels 3 and 4 and another for parcel 5, both dated March 24, 2011, with an effective date of April 17, 2005 (2011 reports).  These new appraisals, which treated the estate's property as separate from TCLT's property, valued parcels 3 and 4 together at $340,000 and parcel 5 at $600,000.

III.    Tax Return Preparation

Respondent received the estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, on January 20, 2006.  Included with the Form 706 was a copy of Mr. Carroll's 2004 report.  On July 5, 2006, the estate

**[\*9]** filed a supplemental Form 706 and reported the values of the estate's property using the values given in Mr. Carroll's 2004 report.

OPINION

A. Introduction

Property includable in the value of a decedent's gross estate generally is to be valued as of the date of the decedent's death. Sec. 2031.[2] For purposes of the estate tax, property value is determined by finding the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and the willing seller are hypothetical persons. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990) (citing Estate of Bright v. United States, 658 F.2d 999, 1006 (Former 5th Cir. 1981)). The hypothetical buyer and seller are presumed to be dedicated to achieving the maximum economic advantage. Id.

Valuation is a factual determination, and the trier of fact must weigh all relevant evidence of value and draw appropriate inferences. Estate of Kelley v.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*10] <u>Commissioner</u>, T.C. Memo. 2005-235; <u>Estate of Deputy v. Commissioner</u>, T.C. Memo. 2003-176.

B.    <u>Assemblage</u>

    1.    <u>Background</u>

Each party called an expert witness to appraise the estate's property.  Both parties' experts agree that if the estate's property could be assembled with TCLT's property, then residential development of the whole would be the highest and best use.  They also agree that if assemblage is not possible, residential development of the estate's property would not be economically feasible.  The parties disagree, however, over whether it is appropriate, under these circumstances, to consider a use that requires combining a property to be valued with another property not under common ownership.

The estate argues that we should use a three-factor test under Florida law. Respondent argues that assemblage is appropriate, citing <u>United States ex rel. TVA v. Powelson</u>, 319 U.S. 266, 275 (1943).

    2.    <u>Florida's Three-Factor Test</u>

The estate suggests that, under State law, we should use the three-factor test described in <u>Dep't of Transp., Div. of Admin. v. Jirik</u>, 498 So. 2d 1253 (Fla. 1986), <u>Mulkey v. Fla. Dep't of Transp.</u>, 448 So. 2d 1062 (Fla. Dist. Ct. App.

**[\*11]** 1984), and <u>Brevard Cnty. v. Canaveral Props, Inc.</u>, 658 So. 2d 590 (Fla. Dist. Ct. App. 1995). Under this test, Florida courts look for the presence of physical contiguity, unity of ownership, and unity of use to determine whether adjoining parcels are separate and independent or a single tract. <u>See, e.g.</u>, <u>Jirik</u>, 498 So. 2d at 1254; <u>Mulkey</u>, 448 So. 2d at 1065.

We look to State law to determine the nature, scope, and validity of a decedent's legal interests and rights in property and to Federal law to determine the Federal taxation of those interests and rights. <u>See</u> <u>Morgan v. Commissioner</u>, 309 U.S. 78, 80 (1940); <u>Estate of Allen v. Commissioner</u>, 29 T.C. 465, 467-468 (1957).

The three-factor test is generally used "in the context of eminent domain proceedings in which severance damages are in dispute".[3] <u>Jirik</u>, 498 So. 2d at 1255; <u>see also</u> <u>Brevard Cnty.</u>, 658 So. 2d 590; <u>Dade Cnty. v. Midic Realty, Inc.</u>, 551 So. 2d 499, 500 (Fla. Dist. Ct. App. 1989); <u>Mulkey</u>, 448 So. 2d at 1065. The Florida Supreme Court has also found the test appropriate to determine whether a taking had occurred in an inverse condemnation action. <u>Jirik</u>, 498 So. 2d at 1255.

---

[3] "Severance damages are awarded when government condemns only a portion of a larger parcel." <u>Dep't of Transp., Div. of Admin. v. Jirik</u>, 498 So. 2d 1253, 1255 n.1 (Fla. 1986) (citing <u>Sharp v. United States</u>, 191 U.S. 341, 354 (1903)).

[*12] In each of these cases Florida courts have used the test to determine whether a government action had resulted in the separation of parcels that were, in effect, a single tract. In other words, the purpose of the three-factor test is to determine whether a landowner has property rights which were infringed by a condemnation or eminent domain action. Our inquiry here is very different. We have not been asked to determine what rights or interests the estate holds in TCLT--and the extent of those rights and interests have in any case already been established. Instead, we are determining the fair market value of the interests the estate holds in its property; and, for that purpose, Federal law controls. See sec. 20.2031-1(b), Estate Tax Regs. Moreover, to our knowledge, the Florida courts have never applied the three-factor test in the context of assemblage, and we would decline to extend the test's use now. Instead we find that the reasonable likelihood test, discussed below, is the more appropriate standard.

3.     Reasonable Likelihood Standard

Under Federal law, a property's fair market value may reflect "not only the use to which the property is presently devoted, but also that use to which it may be readily converted." Powelson, 319 U.S. at 275. If a special or higher use of the land is only possible when it is combined with other parcels, we may consider that special use, but "there must be a reasonable probability of the lands in question

**[*13]** being combined with other tracts for that purpose in the reasonably near future." Id. at 275-276 (citing Olson v. United States, 292 U.S. 246, 255 (1934)).

For example, in Stanley Works & Subs. v. Commissioner, 87 T.C. 389 (1986), we considered the value of a conservation easement placed on a piece of land. The taxpayer argued that the highest and best use of the donated property was as a hydroelectric power plant. Id. at 400. The Commissioner argued that the Court should not consider this special use because a power plant could not be built without assembling the donated property with other parcels not owned by the taxpayer. Id. at 409. We found that "it must be reasonably probable that the property owner would be able to acquire the additional land in the reasonably near future without relying on the power of eminent domain." Id. at 402. Noting that there were several possible sites that could have been acquired by a developer and "there was no evidence to suggest that it would have been unreasonably difficult to acquire such property", we found that assemblage was reasonable and that the valuation of the donated easement should be based on the special use as a hydroelectric power plant. Id. at 409-411.

We have determined that we can value property on the basis of a use of land requiring assemblage if it is reasonably likely that the land will be assembled in the reasonably near future. We must now determine whether the estate's property

**[*14]** was reasonably likely to be combined with TCLT's property at the time of decedent's death. This is a question of fact that can be resolved only by weighing all of the evidence. Stanley Works & Subs. v. Commissioner, 87 T.C. at 408.

Absent proof to the contrary, the use to which the land is currently being put is presumed to be the highest and best use. United States v. L.E. Cooke Co., Inc., 991 F.2d 336, 341 (6th Cir. 1993); United States v. 69.1 Acres of Land, 942 F.2d 290, 292 (4th Cir. 1991); Esgar Corp. v. Commissioner, T.C. Memo. 2012-35, slip op. at 20, aff'd, 744 F.3d 648 (10th Cir. 2014). Therefore, the burden of proof is on respondent to show that assemblage was reasonably likely.

Respondent does not cite, nor have we found, any evidence in the record suggesting that assemblage was reasonably likely. Instead, respondent asks us to assume that assemblage was likely because of (1) the economic benefits of assemblage and (2) the ties between decedent and the various stakeholders in TCLT. The estate argues that respondent's position is unsupported by the caselaw and that the evidence shows that assemblage was unlikely. We agree with the estate.

Both parties' experts opined that assembling the estate's property and TCLT's property would yield the greatest economic benefits, and we agree. However, using that fact as evidence that combining of the properties was

[*15] reasonably likely places the cart before the horse. The economic benefits of assemblage can only come into consideration once we have established that assemblage is otherwise reasonably likely. The only evidence in the record, however, suggests that assemblage was not likely.

First, TCLT has had at least one prior offer to sell its property as part of a residential development, but it declined the offer. This fact tends to show that TCLT's stakeholders were not interested in selling the property just because it would have been in their economic interests. Moreover, both parties' experts testified at trial that they would not recommend to a hypothetical buyer of the estate's property that he purchase the land as a possible investment. Not even respondent's expert believed that assemblage was certain enough to recommend purchase to a client.

Respondent's second argument is based on the premise that assemblage was reasonably likely because decedent held a large minority interest in TCLT that, when combined with either the interests of (1) STGP or (2) the other TCLT stakeholders, would result in a majority vote enabling TCLT to combine its property with the estate's property. However, without any evidence regarding the intent of the other TCLT stakeholders or details as to their relationship with decedent, respondent's position is left essentially attributing ownership of TCLT's

**[*16]** property to decedent solely on the basis of those relationships. This position lacks merit.

In support of his argument, respondent cites our decision in Esgar Corp. v. Commissioner, slip op. at 42, for the proposition that personal friendships and longtime business relationships are sufficient to justify assemblage. Respondent misreads Esgar. In that case, although we did consider the taxpayers' argument that assemblage was reasonable because of their longtime business relationships, we explicitly chose not to decide whether assemblage was reasonable. Id. Furthermore, although it is true that decedent and Mr. Scofield had a business relationship spanning decades, there is no other evidence in the record suggesting that Mr. Scofield or STGP would be inclined to assemble TCLT's property with the estate's property.

There is also no evidence to support the proposition that other members of the Pulling family would be reasonably likely to agree to combine the properties. The mere fact that they are related to decedent is not enough. See Estate of Bright, 658 F.2d at 1006 (rejecting application of family attribution for purposes of valuing property for estate tax purposes); see also Minahan v. Commissioner, 88 T.C. 492, 499 (1987) ("It has been noted that the Congress has explicitly directed that family attribution or unity of ownership principles be applied in certain

[*17] aspects of Federal taxation, and in the absence of legislative directives, judicial forums should not extend such principles beyond those areas specifically designated by Congress.").[4]

Accordingly, we find that assembly of the estate's property with TCLT's property for purposes of residential development is not the highest and best use of the estate's property.

## C.    Value of Estate's Property

Having determined that the estate's property should be treated as individual parcels, rather than as assembled with TCLT's property, we must now determine the fair market values of parcels 3, 4, and 5.  The estate argues that we should adopt the values recommended by its expert in his 2011 reports, which are as follows:

| | |
|---|---|
| Parcels 3 and 4 | $340,000 |
| Parcel 5 | 600,000 |

---

[4]  Estate of Bright v. United States, 658 F.2d 999 (Former 5th Cir. 1981), is binding on the Court of Appeals for the 11th Circuit, to which this case is appealable.  Allen v. Autauga Cnty. Bd. of Educ., 685 F.2d 1302, 1304 n.4 (11th Cir. 1982) ("[D]ecisions of the former fifth circuit in which active judges of this circuit participated are binding precedent, regardless of the date of decision.");  Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981).

**[\*18]** Respondent argues that, assuming assemblage is not reasonably likely, we should adopt the values recommended by the estate's expert in his 2004 report, which are as follows:

| | |
|---|---|
| Parcel 3 | $990,000 |
| Parcel 4 | 130,000 |
| Parcel 5 | 1,250,000 |

Respondent's expert did not offer an opinion as to what the fair market value of the estate's property would be if assemblage was not reasonably likely. Instead, respondent argues that we should adopt the estate's expert's 2004 valuation because, according to respondent, it takes into account additional value provided to the estate's property by the possibility of assembly with TCLT's property.[5]  In other words, respondent argues that even if the estate's property's value should not be based on assemblage, we should recognize a "premium to fair market value" that a buyer of TCLT's property would place on the adjacent property owned by the estate.

_____

[5]  Respondent also argues that we should not adopt the values in Mr. Carroll's 2011 reports because the estate failed to adequately explain the differences between the values in the 2011 reports and those in the 2004 report. We disagree.  At trial Mr. Carroll credibly testified that the 2004 report was prepared using a boundary survey provided by Mr. Pulling that treated the estate's property and TCLT's property as a single tract.  We find this adequately explains the difference between the values reached in the two reports.

**[*19]** We find that respondent's theory is too speculative and is not supported by the record.  In contrast, we found the estate's expert, and his 2011 reports, to be credible, and we therefore adopt the 2011 values.  Accordingly we find that, as of April 17, 2005, the estate's property had a total fair market value of $940,000.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155.